424 So.2d 787 (1982)
STATE of Florida, DEPARTMENT OF ENVIRONMENTAL REGULATION, Appellant,
v.
FALLS CHASE SPECIAL TAXING DISTRICT, Elba, Inc., and Sunshine Development, Inc., Appellees.
No. SS-439.
District Court of Appeal of Florida, First District.
July 23, 1982.
On Rehearing October 15, 1982.
Rehearing Denied January 7, 1983.
On Motions for Rehearing and to Strike January 21, 1983.
*788 Alfred W. Clark, Deputy Gen. Counsel, William L. Hyde, Asst. Gen. Counsel, Tallahassee for appellant.
J.D. Boone Kuersteiner, Akerman, Senterfitt & Eidson, and Kenneth F. Hoffman, Oertel & Laramore, Tallahassee, for appellees.
Stephen W. Metz, Tallahassee, amicus curiae.
*789 BOOTH, Judge.
This cause is before us on appeal by the State of Florida, Department of Environmental Regulation [DER], from an order of the circuit court granting the motion of Falls Chase[1] [appellee] for judgment on the pleadings.
The issues presented on appeal are the jurisdiction of the trial court to entertain suit for declaratory relief and the correctness of the judgment below as to the jurisdiction of DER.
The facts are essentially undisputed. The land in question is located on Upper Lake Lafayette, a privately owned body of fresh water in Leon County. At times in the past, portions of this property have been subject to inundation by waters of the lake, but sinkhole development in the lake, a natural phenomenon, has caused the lowering of the water level. The area sought to be regulated by DER has been dry for a number of years. Past uses include timbering, farming and grazing of cattle.
It is uncontroverted that the lands are "uplands," as defined by DER rule,[2] not subject to DER dredge and fill regulation under that rule.
It is stipulated by the parties that there are no sovereignty lands involved in this dispute.
In December of 1978, and again in February of 1979, representatives of DER met with representatives of the District for briefing and on-site inspection in connection with planned construction and installation of domestic waste-water collection systems and treatment facilities, and to determine if any portions of the property were subject to dredge and fill regulation under Chapter 403.
Prior to this inspection, DER had determined the extent of its dredge and fill jurisdiction over privately owned freshwater areas by means of an "aquatic plant vegetation index,"[3] as required by Section 403.817, Florida Statutes. DER representatives continued to abide by the provisions of that statute and by Florida Administrative Code Rule 17-4.02, and to affirm to appellees the lack of jurisdiction over dredge and fill operations on the property until March of 1979.
On March 21, 1979, The Secretary of the Department of Environmental Regulation met with the representatives of the District and stated that the agency was considering making a claim of dredge and fill jurisdiction to the "ordinary high water line" boundary.
On April 5, 1979, the Deputy General Counsel of DER wrote to appellees setting out DER's intention to use the "ordinary high water mark"[4] on the particular property as the determinant of its dredge and fill jurisdiction, stating that a survey crew would be sent out to establish that line and concluding:
Until this line is determined we request that no further filling be done in this area until an ordinary high water line is established. We intend to take enforcement action for the work which has gone on to date unless a satisfactory resolution is reached to these apparent violations. We will offer your client the opportunity for an informal conference to discuss a resolution of the violation prior to initiating a formal enforcement action. If you wish to take advantage of this offer, please contact me within ten days from the date of this letter.
*790 Appellees continually and consistently denied DER's claim of jurisdiction.[5] In May of 1979, the parties entered into a stipulation allowing Falls Chase to continue construction and giving DER permission to come onto the property in an attempt to identify an ordinary high water line.[6] That line was not identified by the agency until August of 1979. By certified letter of August 9, 1979, The Secretary of the Department of Environmental Regulation advised appellees, in part, as follows:
The Department has determined that the ordinary high water line of Upper Lake Lafayette lies between 44.8 and 46.6 feet mean sea level... .
For the purpose of this proceeding the department intends to exert its regulatory jurisdiction under Chapter 403, Florida Statutes, below 44.8 feet mean sea level.
... .
Accordingly, you are hereby directed to submit the appropriate after-the-fact permit applications for the areas depicted on Exhibit F to the stipulation which are below the 44.8 feet contour level within thirty days of the receipt of this letter. Failure to do so shall constitute a violation of the terms and conditions of the stipulation and Sections 403.087(1) and 403.161(1)(b), Florida Statutes, and Sections 17-4.03 and 17-4.28, Florida Administrative Code, and shall be subject to appropriate enforcement action by the Department.
You are further directed to cease the placement of fill materials in those areas depicted in Exhibit F to the Stipulation which are below the 44.8 contour line. Failure to do so shall constitute a violation of the terms and conditions of the Stipulation and Sections 403.087(1) and 403.161(1)(b), Florida Statutes, and Sections 17-4.03 and 17-4.28, Florida Administrative Code, and shall be subject to appropriate enforcement action by the Department.
On August 28, 1979, Falls Chase filed a petition for writ of prohibition against DER with this court. The writ was denied September 6, 1979, by unpublished order.[7] DER's contention that this court's denial of prohibition precludes further consideration of the jurisdictional issue is without merit.[8]
On September 11, 1979, appellees filed a complaint in circuit court for declaratory and injunctive relief. DER answered and *791 filed a counterclaim against appellees Sunshine and Elba in the nature of a civil action for the entry and enforcement of a permanent injunction and fine pursuant to Sections 403.131(1) and 403.141(1), Florida Statutes, for violations of Chapter 403, Florida Statutes, and Chapter 17-4, Florida Administrative Code.
The circuit court granted Falls Chase's motion for judgment on the pleadings, holding that DER had exceeded its statutory grant of authority and was without jurisdiction to regulate appellees' dredge and fill activities. The court enjoined DER from attempting to extend its jurisdiction beyond the vegetative index required by statute and promulgated in Florida Administrative Code Rule 17-4.
On appeal to this court, DER contends that the circuit court is without jurisdiction because appellees failed to exhaust administrative remedies, and that it has dredge and fill jurisdiction as claimed over appellees' property. We will consider the last contention first.
The grant of authority to DER to regulate dredge and fill activities is Section 403.817, Florida Statutes, adopted effective June 9, 1977, providing:
(1) It is recognized that the levels of the waters of the state naturally rise and fall, depending upon tides and other hydrological, meteorological, and geological circumstances and features. The natural rise and fall of the waters is essential to good water quality, but often makes it difficult to determine the natural landward extent of the waters. Therefore, it is the intent of the Legislature that the Department of Environmental Regulation establish a method of making such determination, based upon ecological factors which represent these fluctuations in water levels.
(2) In order to accomplish the legislative intent expressed in subsection (1), the department is authorized to establish by rule, pursuant to chapter 120, the method for determining the landward extent of the waters of the state for regulatory purposes. Such extent shall be defined by species of plants or soils which are characteristic of those areas subject to regular and periodic inundation by the waters of the state. The application of plant indicators to any areas shall be by dominant species.
(3) Amendments adopted after April 5, 1977, to the rules of the department adopted before April 5, 1977, relating to dredging and filling and which involve additions or deletions of the vegetation or soil indices or the addition or deletion of exemptions shall be submitted in bill form to the Speaker of the House of Representatives and to the President of the Senate for their consideration and referral to the appropriate committees. Such rule amendments shall become effective only upon approval by act of the Legislature.
... .
(5) The landward extent of waters as determined by the rules authorized by this section shall be for regulatory purposes only and shall have no significance with respect to sovereign ownership. (emphasis supplied)
The Legislature, in the above statute, requires the Department to establish a method of determining the natural landward extent of waters of the state by identification of vegetation or soils, a method which takes into account natural fluctuations in water levels. The Legislature also carefully circumscribed the manner in which DER is to exercise the power granted and specified: (1) The natural landward extent of waters is to be identified by ecological factors, specifically plant or soil characteristics of areas subject to regular and periodic inundation. (2) The method for determining the landward extent of the waters of the state for regulatory purposes is to be established by rule. (3) Any amendments to dredge and fill rules relating to plant or soil indices or exemptions must be submitted in "bill form" to both houses of the *792 Legislature for consideration and referral to appropriate committees, and become effective only upon approval by act of the Legislature.[9]
DER amended Florida Administrative Code Rule 17-14.02 in 1975 to set forth definitions and a vegetation index comprised of many different species of plant life. At the time of this litigation, no soil index, as permitted by Section 403.817, had been adopted by DER. Rule 17-14.02 defines "submerged lands" [17-4.02(17)] and "transitional zones[s] of submerged land[s]" [17-4.02(19)], both of which are subject to dredge and fill regulation. The rule also defines "uplands" [17-4.02(18)], which are not subject to dredge and fill regulation.[10]
DER concedes the land in question does not have plant life indicative of areas subject to regular periodic flooding under the index required by statute and promulgated by DER rule.
DER, nonetheless, and in the face of all of the above, asserts that it has jurisdiction to regulate activities on this land under the general provisions of Section 403.031(3), Florida Statutes, which refers to "waters of the state." We find this claim of jurisdiction totally unsupported by statute or rule and without credible basis, as did the trial court.[11]
The claim of jurisdiction by DER is devoid of merit for a number of reasons, including, but by no means limited to: (1) Section 403.817, Florida Statutes, specifies the method by which dredge and fill regulatory jurisdiction is to be determined. The ordinary high water mark is not one of the methods prescribed. (2) At common law, the ordinary high water mark was used to establish the line of ownership between publicity owned bodies of water and privately *793 owned land[12] and would have no application here, since ownership is not at issue in this case. (3) It is not permissible under the terms of Section 403.817 for DER to modify its jurisdiction by substituting ordinary high water mark for the methods specified by statute, but, even if permissible, such a change would require adoption of a rule subject to legislative approval. Section 403.817, Florida Statutes.
As shown above, the statute mandates the specific methods to be used in determining DER regulatory jurisdiction over the landward extent of water bodies in the state. So determined was the Legislature that only aquatic plant or soil indices be used to define the limits of DER jurisdiction and that these indices, once established, remain constant, that Section 403.817(3) further provides DER may neither add nor delete a single plant or soil without specific prior legislative approval.
An agency has only such power as expressly or by necessary implication is granted by legislative enactment.[13] An agency may not increase its own jurisdiction and, as a creature of statute, has no common law jurisdiction or inherent power[14] such as might reside in, for example, a court of general jurisdiction. When acting outside the scope of its delegated authority, an agency acts illegally and is subject to the jurisdiction of the courts when necessary to prevent encroachment on the rights of individuals.
We hold, therefore, DER was without jurisdiction to regulate dredge and fill activities on the land in question.
The remaining question is the right of appellees to seek judicial determination of the jurisdictional issue without exhaustion of administrative remedies. In this regard, DER contends Falls Chase should have first applied to DER for dredge and fill permits raising the jurisdictional issue in that proceeding followed, if necessary, by administrative appeal and appeal to this court under Section 120.68. It is also suggested that the declaratory statement procedure under Section 120.565 was an available remedy.[15]
*794 The enactment of Florida Statutes, Chapter 120, effective January 1, 1975, afforded new administrative remedies and severely curtailed the need for extraordinary judicial relief. Only in exceptional cases may the courts assume jurisdiction to render declaratory and/or injunctive relief without requiring exhaustion of administrative remedies.
A challenge to agency jurisdiction on persuasive grounds is a widely recognized exception to the exhaustion doctrine.[16] A leading decision of the United States Supreme Court, Leedom v. Kyne, 358 U.S. 184, 188-89, 79 S.Ct. 180, 183-184, 3 L.Ed.2d 210 (1958), holds:[17]
This suit is not one to "review," in the sense that that term is used in the [Wagner] Act, a decision of the Board made with in its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act... . Plainly, this was an attempted exercise of power that had been specifically withheld.
State courts which have considered the matter recognize the exception;[18] and as stated by Professor Schwartz, allegations of lack of jurisdiction are properly dealt with on the pleadings except in rare cases.[19]
In Odham v. Foremost Dairies, Inc., 128 So.2d 586, 592-93 (Fla. 1961), the Florida Supreme Court held:
In those instances where there have been gross or flagrant abuses of power, or where such agencies have attempted to act beyond the powers delegated to them, the courts have unhesitatingly intervened. . .. An examination of the many authorities of text on this question reveals a consistent attitude of the courts that judicial intervention with administrative action is justified only in those instances where the invalidity of the administrative act is not subject to reasonable differences of opinion. (emphasis supplied)
*795 In Gulf Pines Memorial Park v. Oaklawn Memorial Park, Inc., 361 So.2d 695, 699 (Fla. 1978), the Florida Supreme Court held:
[T]he question of "need" for a cemetery would never be reached, if, as Oaklawn claims, Chapter 76-251 is either unconstitutional or inapplicable. ... [I]t is pointless to require applicants to endure the time and expense of full administrative proceedings to demonstrate "need" before obtaining a judicial determination as to the validity of the statutory prerequisite. (emphasis supplied)
The fundamental jurisdiction of courts in the administrative arena was recognized in State ex rel. Department of General Services v. Willis, 344 So.2d 580, 590 (Fla. 1st DCA 1977), wherein this court held:
We have acknowledged that the Administrative Procedure Act does not and cannot displace circuit court jurisdiction to enjoin enforcement of facially unconstitutional agency rules. [citations omitted] That jurisdiction remains unimpaired, a necessary concomitant of the judicial power vested in the circuit courts by Article V, Sections 1 and 5 of the Constitution. (emphasis supplied).
In Willis, this court referred specifically to circuit court jurisdiction to enjoin enforcement of facially unconstitutional rules. More egregious is the situation represented by the instant case where the agency has undertaken to act without a rule and in a manner clearly contrary to its statutory authorization. Had agency action in the instant case been dignified by the adoption of a rule purporting to authorize its claim of jurisdiction, the rule itself would be invalid unless submitted to both houses of the Legislature for prior approval under Section 403.817. Thus, acting without benefit of statute or rule and contrary to its enabling legislation, the agency's action is patently invalid and the basis for court intervention clear.
The Willis case, though not involving agency jurisdiction,[20] states the "key factors" to determine when a court should undertake to decide a question of agency jurisdiction prior to exhaustion of administrative remedies. Willis quotes with approval from Professor Davis' treatise as follows:[21]
Professor Davis [3 K. Davis, Administrative Law Treatise 69 (1958)] there cites three "key factors" which should influence the judicial decision whether to intervene by extraordinary writ or defer to the administrative remedy:
Extent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question... . (emphasis supplied)
This quotation is part of Professor Davis' discussion of lack of agency jurisdiction as an exception to the doctrine of exhaustion of administrative remedies. Davis continues:
Unfortunately, each of these three key factors is a variable, and each often calls for a considerable amount of judgment for its proper appraisal.
A workable standard probably should not go beyond a statement that each of these three factors should be weighed in determining whether or not a court should decide an issue of administrative jurisdiction without requiring exhaustion of administrative remedies. (emphasis supplied)
In weighing the various factors, Professor Davis concludes that, where lack of administrative jurisdiction "clearly appears on the *796 surface," exhaustion should probably not be required even though the injury from the administrative proceeding would be slight.[22]
Analyzing Davis' three factors in light of the instant case, the record reveals that injury from the pursuit of administrative remedy in the instant case includes time and expense, and, in addition, the inability of appellees to make use of their property due to the agency's assertion of regulatory jurisdiction with resulting financial loss to the property owner. The second factor approved by Professor Davis, "degree of apparent clarity or doubt about administrative jurisdiction," is resolved strongly in favor of appellees in that, as previously pointed out, the agency's claim of jurisdiction is clearly without merit. The third Davis factor is likewise determined in favor of appellees, since the question presented is one of law and involves no specialized administrative understanding, nor indeed any factual issues. Weighing these three factors then, we find the balance requires resolution of the jurisdictional issue without exhaustion of administrative remedies.
When an agency acts without colorable[23] statutory authority that is clearly in excess of its delegated powers, a party is not required to exhaust administrative remedies before seeking judicial relief. A finding of lack of colorable statutory authority provides the necessary limitation on this exception to the requirement of exhaustion of administrative remedies.[24] A jurisdictional *797 claim which has apparent merit, or one which depends upon factual determination in most instances requires exhaustion of administrative remedies before resort to judicial forum.[25] In Odham v. Foremost Dairies, Inc., 128 So.2d 586, 593 (Fla. 1961), the Florida Supreme Court held:
An examination of the many authorities of texts on this question reveals a consistent attitude of the courts that judicial intervention with administrative action is justified only in those instances where the invalidity of the administrative act is not subject to reasonable differences of opinion.
DER's jurisdictional claim is clear and has been articulated by its top-ranking official. Whether DER's action could be labeled "free form"[26] is without consequence to determination of the jurisdictional issue presented.[27]
The trial court correctly denied DER's motion to dismiss and entered judgment on the pleadings for appellees.
AFFIRMED.
SHAW, J., concurs.
ROBERT P. SMITH, Jr., C.J., dissents with written opinion.
ROBERT P. SMITH, Jr., Chief Judge, dissenting.
The majority overthrows a vast body of Florida APA precedent restricting circuit court litigation and requiring exhaustion of adequate chapter 120 remedies for the resolution of disputes generated in free-form dealings between agencies and affected persons. Whether chapter 403 permits Falls Chase to dredge and fill without restriction in the historic basin of Upper Lake Lafayette is a question the Department of Environmental Regulation is entirely competent to decide, given its obvious regulatory jurisdiction over the pollution of lakes. Sections 403.061, .031(2), (3), Florida Statutes (1981). Like all other agencies of the executive branch in their respective fields, the Department was required to decide the applicability of chapter 403 to Upper Lake Lafayette under disciplines imposed by the APA; it specifically was required, if asked, to declare and demonstrate, through an order reviewable by this Court if necessary, any applicability that chapter 403 may have in the particular circumstances prevailing at Upper Lake Lafayette. Sections 120.565, .68.
*798 Falls Chase studiously avoided this available and wholly adequate administrative remedy. Instead, Falls Chase temporized until its advancing construction created a condition of urgency, then launched this collateral circuit court attack on the Department's position taken in free-form proceedings[1] not subject to APA disciplines. The allegation on which Falls Chase invoked the circuit court's jurisdiction, that Falls Chase was repeatedly refused APA remedies, was so transparently without merit that it does not bear judicial mentioning, and it was not mentioned either in the circuit court "judgment on the pleadings" or in the majority's decision. That frivolous allegation, it appears, served only to open the circuit court doors and to defeat the Department's motion to dismiss the complaint for failure to exhaust administrative remedies. After serving those purposes the allegation played no further part in the circuit court's decision "on the pleadings," though the allegation was denied by the Department's answer and the record convincingly refutes it. The circuit court thus decided the merits of the dispute and the majority has done the same, cloaking the decision in a labored analysis to the effect that the agency lacked jurisdiction because its position taken in free-form proceedings was not "colorably" correct.
The well-considered and reliable Florida rule that APA remedies must be exhausted, if they are adequate, is thus cast aside without any effort to demonstrate its sudden want of merit, and without any showing that adherence to it would have done even the slightest momentary injury to Falls Chase. Indeed, as will be shown, adherence to that principle by Falls Chase voluntarily, or by the circuit court, would have routinely ended this dredge-and-fill controversy in 1979. Instead, expediency prevailed and it still prevails. The majority, apparently attracted to the notion that the circuit court, after all, got to the right result on the merits, overthrows the Florida exhaustion requirement in favor of an amalgam of selected federal case law on exhaustion which Professor Davis rightly calls "unprincipled," that case law having become since 1975 "even more disorderly than it previously was."[2] The majority does not improve the federal brew by adding to it Professor Davis' own variation on the federal theme, a "weighing" of factors including the "degree of apparent clarity or doubt" concerning the extent of the agency's power. As the professor himself says, his proposal "has been a failure,"[3] not only for the reason he assigns, that just one federal court of appeals has used it by name, but also because the professor has merely rearranged and renamed the same "unprincipled" and "disorderly" subjective factors he wishes to banish from federal case law. Because Davis' restatement of federal law is equally susceptible to manipulation by result-oriented users, it is equally unpredictable in application, therefore equally productive of disruptive and unnecessary litigation such as this. Just recently this Court rejected a proposal to substitute for Florida's brightline rule one of the endlessly variable versions of federal case law that  can anyone be suprised?  requires judicial abstention where the Florida rule now permits discreet circuit court intervention to decide a threshold question of statutory constitutional validity. See Smith v. Willis, 415 So.2d 1331 (Fla. 1st DCA 1982), where the Court saw "no reason to venture *799 such a fundamental reordering of mature Florida exhaustion law ..., least of all on the basis of imported federal precedent which ... is anything but coherent and predictable in application... ." 415 So.2d at 1336.
The Court in Smith v. Willis saw no reason to displace Florida's exhaustion rule in favor of one branch of federal case law that counsels more judicial abstention; and there is no reason here to displace Florida's rule in favor of other federal case law that counsels less. The vice of all the wonderfully varied federal doctrine is its subjectivity and unpredictability; and while such flawed doctrine may have to suffice for the federal judicial system, for reasons I shall mention in part V, and for national scholars whose work understandably feeds almost exclusively upon federal APA law, Florida's chapter 120 has "varied and abundant remedies for administrative error" that are markedly more effective than those of the federal Act, and more accessible. See State ex rel. Department of General Services v. Willis, 344 So.2d 580, 590 (Fla. 1st DCA 1977). Correspondingly there is neither need nor justification for supplanting Florida's firm exhaustion principle with the federal import.
Seeking to find in the Willis decision some basis for bypassing adequate APA remedies in favor of collateral court litigation over the extent of the agency's regulatory power, the majority seems to suggest, ante, 424 So.2d at 795, that Willis swallowed Davis' restatement of federal law whole by quoting it in footnote 10, 344 So.2d at 590. That simply is not the case. The same footnote goes on to report that the Davis treatise recommends elsewhere that Congress "[g]et rid of extraordinary remedies as a means of review" and "[e]stablish a single, simple form of proceeding for all review of administrative action," such as the direct appeal provided by section 120.68 of the Florida APA. But of course Willis did not relegate to a footnote the whole point of its lengthy and concentrated discussion. The summary paragraph in the text of Willis, to which all the preceding discussion pointed, stated in terms that cannot be overlooked that circuit court intervention in agency disputes is justified only when APA remedies are unavailable or inadequate:
Does the complaint of the respondent contractors demonstrate some compelling reason why the Administrative Procedure Act does not avail them in their grievance against the Department, and why the circuit court must therefore intervene? We think it does not. No lack of general authority in the Department is suggested; nor is it shown, if that is the case, that the Act has no remedy for it. No illegal conduct by the Department is shown; nor, if that is the case, that the Act cannot remedy the illegality. No departmental ignorance of the law, the facts or the public good is shown; nor, if any of that is the case, that the Act provides no remedy for it. No claim is made the Department ignores or refuses to recognize relators' substantial interests, or refuses to afford a hearing, or otherwise refuses to recognize that relators' grievance is cognizable administratively. The respondent contractors have made no showing that remedies available under the Act are inadequate. (344 So.2d at 591, emphasis added.)
Willis thus does not lend support for the majority's view that a circuit judge should enjoin free-form agency action that the judge thinks is beyond the agency's power or is "without colorable statutory authority." Ante, 424 So.2d at 796. The holding of Willis was exactly the opposite: that whatever the complaint about agency action, be it "lack of general authority" or "illegal conduct" or "ignorance of the law, the facts or the public good," a circuit court must not intervene and preempt APA processes unless it is shown that remedies available under the Act cannot adequately deal with the complaint.

I.

Reviewing the decisions, 1977-1982, turning on the adequacy of chapter 120 remedies.

Willis proposed, in 1977, a "judicial freshening of the doctrines of primary jurisdiction *800 and exhaustion of remedies," by means of requiring exhaustion of adequate administrative remedies. Since then an unbroken line of decisions by Florida appellate courts, including those of the Florida Supreme Court, have addressed exhaustion questions in terms of the availability and adequacy of administrative remedies. Those decisions, arranged chronologically from 1977 to June 1982, include (emphasis added):

School Board of Leon County v. Mitchell, 346 So.2d 562, 569 (Fla. 1st DCA 1977), cert. den., 358 So.2d 132 (Fla. 1978) ("Appellee, as a party whose interests were `substantially affected,' could have had that issue decided ... by hearing held pursuant to Section 120.57(1), Florida Statutes (1975). Under such circumstances a declaratory judgment action will not lie.")

Jefferson National Bank of Miami Beach v. Lewis, 348 So.2d 348 (Fla. 1st DCA 1977) ("[T]he appealed order of the Leon County Circuit Court granting Jefferson declaratory and injunctive relief, although in substance entirely correct, is REVERSED and the cause REMANDED for dismissal because adequate remedies were and are available under Chapter 120 ....")

United Faculty of Florida FEA v. Branson, 350 So.2d 489, 493 (Fla. 1st DCA 1977) ("Adequate remedies for administrative determination of that question, and for judicial review, existed under Chapter 120, and no emergent or other unusual circumstances were sufficiently shown to bypass the administrative remedy... . "[W]ere we to approve an expansion of the circuit court's jurisdiction [to enforce the Public Records Act, ch. 119] to decide pendant questions determinable under available and adequate administrative remedies, we would quickly dissipate the benefits of a uniform Administrative Procedure Act.")

Adams Packing Association, Inc. v. Florida Department of Citrus, 352 So.2d 569, 571 (Fla. 2d DCA 1977) ("The Administrative Procedure Act does not then provide an adequate administrative remedy, and the procedure for review of agency action established by the Act is not applicable to this dispute.")

Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695, 699 (Fla. 1978) ("... Oaklawn did not attempt to avoid administrative remedies, but merely sought to have them delayed in a reasonable effort to seek a judicial declaration of rights that could not be obtained administratively.")

Carrollwood State Bank v. Lewis, 362 So.2d 110, 116 (Fla. 1st DCA 1978), cert. den., 372 So.2d 467 (Fla. 1979) ("No statute, rule nor regulation, nor the application thereof is challenged; nor is there any allegation nor demonstration of inadequacy of administrative remedies under chapter 120.")

State ex rel. Florida State Board of Nursing v. Santora, 362 So.2d 116, 117 (Fla. 1st DCA 1978) ("Suffice to say, here as in Willis, there has been no showing that the remedies available under the Administrative Procedure Act are inadequate. ...")

Metropolitan Dade County v. Department of Commerce, 365 So.2d 432, 433 (Fla. 3d DCA 1978) ("We hold that the declaratory judgment and injunctive remedy resorted to herein is applicable only in those extraordinary cases where a party has no other adequate administrative remedy to cure egregious agency errors or where a party's constitutional rights are endangered.")

Department of Health and Rehabilitative Services v. Lewis, 367 So.2d 1042, 1045 (Fla. 4th DCA 1979) ("In sum, the fact that Mrs. Lewis claimed ... even the right to compel HRS to comply with its own rules and regulations in handling such problems, is not a sufficient basis to invoke circuit court jurisdiction. No claim is made that HRS itself cannot remedy any illegality in its procedures or correct any error in the manner in which they are carried out.")

Coulter v. Davin, 373 So.2d 423, 427-28 (Fla. 2d DCA 1979) ("On the other hand, the constitutional validity of the law pursuant to which the administrative agency *801 takes action, or the constitutional validity of some act of the agency taken in previous proceedings, in the form of a rule or regulation or some other form, are matters which the administrative agency may not determine.")

Junco v. State Board of Accountancy, 390 So.2d 329, 331 (Fla. 1980) ("The principle underlying the exhaustion requirement is inapplicable where adequate remedies do not abide within the administrative sphere.")

Department of Professional Regulation v. Hall, 398 So.2d 978, 979 (Fla. 1st DCA 1981) ("As a result of this peculiar statutory arrangement, by which the legislature has granted the Department only the appearance of authority over its subsidiary boards, but little direct power in fact, the legislature has deprived the executive branch of clear effective authority to take action resolving the dispute by means of the Administrative Procedure Act.")

Department of Business Regulation v. N.K., Inc., 399 So.2d 416 (Fla. 3d DCA 1981) ("The licensee [who won a circuit court injunction] ... clearly had another remedy. Section 120.68 ... provides for immediate review in the appropriate District Court of Appeal... .")

Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 400 So.2d 66, 74 (Fla. 1st DCA 1981) ("The Chapter 120 remedies plainly were adequate, and the circuit court correctly declined `to employ an extraordinary remedy to assist a litigant who has foregone an ordinary one which would have served adequately.'")

Ortega v. Owens-Corning Fiberglas Corp., 409 So.2d 530, 532 (Fla. 1st DCA 1982) ("In no sense, therefore, is Ortega's claimed remedy [declaration of the unconstitutionality of chapter 440] available in chapter 440 proceedings before a deputy; in no sense are the proceedings authorized by chapter 440 adequate to resolve Ortega's claim for common law money damages.") [Emphasis by the court.]

Communities Financial Corp. v. Florida Department of Environmental Regulation, 416 So.2d 813, 816 (Fla. 1st DCA 1982) ("In Willis, this Court set forth certain criteria which, if met, would invoke the jurisdiction of the circuit court in such cases: (1) the complaint must demonstrate some compelling reason why the APA ... does not avail the complainants in their grievance against the agency; or (2) the complaint must allege a lack of general authority in the agency and, if it is shown, that the APA has no remedy for it; or (3) illegal conduct by the agency must be shown and, if that is the case, that the APA cannot remedy that illegality; or (4) agency ignorance of the law, the facts, or public good must be shown and, if any of that is the case, that the Act provides no remedy; or (5) a claim must be made that the agency ignores or refuses to recognize related or substantial interests and refuses to afford a hearing or otherwise refuses to recognize that the complainants' grievance is cognizable administratively... . Since such avenues of relief were not pursued, we cannot conclude that the remedies of the administrative process were inadequate.")

State of Florida, Department of General Services v. Biltmore Construction Co., 413 So.2d 803, 804 (Fla. 1st DCA 1982) ("As a matter of policy, a court should not exercise its jurisdiction if an adequate administrative remedy is available until that remedy has been exhausted. ... If [the Department] claims damages in excess of [the amount of retainage it holds], its only remedy is in court because the only adjudication that can be made in the administrative proceeding is whether or not Biltmore is entitled to be paid all of the retainage, part of it or none of it.")
The uniform message of these decisions, including those authorizing court intervention if the threshold question is one of facial validity of a statute under the Constitution, is that administrative remedies must be resorted to or not depending on whether the available remedies are adequate. Given *802 agency authority to decide the issue in question, the decisive question is whether the litigant seeking circuit court intervention has shown convincingly that chapter 120 remedies cannot in good order and in a reasonable time resolve the issue. In this line of decisions there is no warrant for a circuit court overriding adequate chapter 120 remedies on the ground that the judge thinks the agency's free-form position is demonstrably wrong. On the contrary, the decisions teach that adequate APA remedies must be resorted to even for cure of "egregious" agency errors, Metropolitan Dade County, supra, 365 So.2d at 433, even for correction of "untenable" agency positions, Carrollwood, supra, 362 So.2d at 113, even if the circuit court's contrary view of statutory requirements is "in substance entirely correct," Jefferson, supra, 348 So.2d at 348.
Nor does the Supreme Court's 20-year-old decision in Odham v. Foremost Dairies, Inc., 128 So.2d 586, 592-93 (Fla. 1961) authorize judicial preemption of processes enacted by the 1974 Legislature to discipline agency decision-making. In Odham, which itself reversed an intervening circuit court, the Supreme Court delivered a general historical survey of the exhaustion principle, and in dicta not controlling Odham or any decision cited by Odham, drew from textbooks the phrases now seized upon by the majority, that "courts have unhesitatingly intervened" when "agencies have attempted to act beyond the powers delegated to them" or when "the invalidity of the administrative act is not subject to reasonable differences of opinion." What was remarkable about Odham was not this inoperative dicta but the result itself, a reversal of circuit court intervention executing the Court's forceful warning against "promiscuous intervention" by courts "except for most urgent reasons," 128 So.2d at 593:
We must assume that these agencies will follow the mandates of the Constitution and laws in the discharge of their duties. If they fail to do so, those aggrieved may resort to the courts for a review of such actions.
When Odham was decided, our present chapter 120 was yet 13 years in the future; even the aboriginal Administrative Procedure Act of 1961 had not yet been enacted, chapter 61-280, Laws of Florida, chapter 120, Florida Statutes (1961) (became law June 22, 1961, effective July 1); and judicial review of agency action was not by appeal as of right to a district court of appeal, as now provided by section 120.68, but was by petition for certiorari to a district court of appeal or, significantly, to a circuit court  before whom it might plausibly have been argued then, but now no longer, that its early intervention to decide certain questions would simply accelerate the same court's inevitable decision. Odham, 128 So.2d at 593, n. 14. Thus, 16 years later, Willis read that and other worthy but dated decisions in their proper historical context:
Forceful as those authorities are [requiring exhaustion of adequate administrative remedies], they weighed administrative processes and remedies which were primitive in comparison to those available under the Administrative Procedure Act of 1974. Those decisions could not have calculated the adequacy, as we must, of an administrative process which subjects every agency action to immediate or potential scrutiny; which assures notice and opportunity to be heard on virtually every important question before an agency; which provides independent hearing officers as fact finders in the formulation of particularly sensitive administrative decisions; which requires written findings and conclusions on impact issues; which assures prompt administrative action; and which provides judicial review of final, even of interlocutory, orders affecting a party's interests. 344 So.2d at 590.
The "judicial freshening of the doctrines of primary jurisdiction and exhaustion of remedies, and greater judicial deference to the legislative scheme," proposed by Willis, 344 So.2d at 590, came to pass in the decisions catalogued above, and for sound reasons set out in part V of this opinion those recent decisions should be adhered to. But *803 for now the point to be made is that the 1961 Odham dicta relied upon by the majority opinion has never since, not once, been relied on by a Florida appellate court to justify circuit court intervention on nonconstitutional issues  not before the 1974 APA was enacted, and certainly not since. Rather, when Odham's historical discourse on the exhaustion requirement has been cited or quoted in nonconstitutional decisions since, that language was employed to require exhaustion, not to excuse it. Florida State Board of Medical Examiners v. James, 158 So.2d 574 (Fla. 3d DCA 1963); Board of Public Instruction of Taylor County v. State ex rel. Reaves, 171 So.2d 209 (Fla. 1st DCA 1964); Marx v. Welch, 178 So.2d 737 (Fla. 3d DCA 1965), cert. den., 188 So.2d 313 (Fla. 1966); Tampa Port Authority v. Deen, 179 So.2d 416 (Fla. 2d DCA 1965); Pest Control Commission of Florida v. Ace Pest Control, Inc., 214 So.2d 892 (Fla. 1st DCA 1968); Cole v. Southern Bell Telephone and Telegraph Co., 221 So.2d 200 (Fla. 3d DCA 1969); Pushkin v. Lombard, 279 So.2d 79 (Fla. 3d DCA 1973), cert. den., 284 So.2d 396 (Fla. 1973); Duval County School Board v. Armstrong, 336 So.2d 1219 (Fla. 1st DCA 1976), cert. den., 345 So.2d 420 (Fla. 1977); School Board of Leon County v. Mitchell, 346 So.2d 562 (Fla. 1st DCA 1977), cert. den., 358 So.2d 132 (Fla. 1978); General Electric Credit Corp. of Georgia v. Metropolitan Dade County, 346 So.2d 1049 (Fla. 3d DCA 1977); Planning and Zoning Board of the Town of Orange Park v. Kager, 351 So.2d 402 (Fla. 1st DCA 1977); Kaufman v. Machiedo, 357 So.2d 739 (Fla. 3d DCA 1978), cert. den., 364 So.2d 888 (Fla. 1978); and Florida Power Corp. v. Advance Mobile Homes, Inc., 386 So.2d 897 (Fla. 5th DCA 1980), pet. rev. den., 394 So.2d 1151 (Fla. 1981).
In keeping with the abundant precedent requiring judicial abstention if an adequate chapter 120 remedy is available, it is appropriate now to identify that remedy.

II.

Identifying the adequate APA remedy: a petition for declaratory 
statement.
This dispute arises from a proposal by Falls Chase, a special taxing district by virtue of a 1975 Leon County ordinance, and by Sunshine and Elba, owners of most of the district's land, to build water distribution and sewer systems on Sunshine's and Elba's land, through publicly financed bonds, in or adjoining Upper Lake Lafayette in Leon County. There is no doubt that Department permits were required for both the water and sewer systems, separate and apart from permits to dredge and fill in the lake basin. Sections 403.086, .087, .861(9), Fla. Stat. (1979). In fact Falls Chase applied for and the Department issued or was prepared to issue those permits, reserving only the question of dredge-and-fill permits for pipelines below the high water line in Upper Lake Lafayette.
On December 21, 1978, at the request of Falls Chase, its representatives met with the Department's at Lake Lafayette to discuss Falls Chase's proposed construction and the extent of the Department's regulatory jurisdiction under chapter 17-4, Florida Administrative Code, implementing chapter 403, Florida Statutes (1979). They met again on February 15, 1979, so that (Falls Chase's attorney wrote) "the Department may attempt to physically identify any portions of the proposed project which might be subject to state regulation pursuant to chapter 17-4, Florida Administrative Code." After that meeting Falls Chase's attorney had the impression that the Department's representatives agreed "that construction of the four upland ponds, installation of roadways and placement of compacted fill, as contemplated in the development plan, were all located on upland sites that were not within the jurisdiction of DER's dredge and fill permitting regulations." But at a March 12 meeting (Falls Chase's attorney wrote on March 21) "it became apparent that the DER regulatory jurisdictional questions ... were in fact unresolved in the minds of certain DER representatives."
The emerging position of the Department's staff was that despite section 403.817 and the Department's rule establishing *804 a vegetation index, Upper Lake Lafayette nevertheless remained a "lake" subject to state control under chapter 403 to the historic ordinary high water mark, albeit that mark was landward of the present vegetation line. Section 403.031(3), Fla. Stat. (1979).
Falls Chase disputed that interpretation of chapter 403 exactly as the circuit court and now the majority here have disputed it. So, going to the heart of the matter, Falls Chase's counsel challenged Secretary Varn, head of the Department, by letter of March 21, 1979:
1) [I]s it your opinion that the [vegetation] species indicators specified in Rule 17-4.02(17) and (19), are not intended to define the landward extent of waters of the state for dredge and fill regulatory purposes under Chapter 403, Florida Statutes?
2) in the event the landward extent of the Department's regulatory jurisdiction over dredge and fill projects is not limited by the species indicators in Rule 17-4, what is the Department's definition of mean high water line as the Department interprets that term under Chapter 403?
3) what is the specific legal authority for using a mean high water line criteria to determine the landward extent of the Department's dredge and fill regulatory jurisdiction pursuant to Chapter 403?
and 4) where in the rules and regulations promulgated under Chapter 403 has the mean high water line test been adopted by the Environmental Regulation Commission as a standard or criteria of the Department for determining the landward extent for dredge and fill jurisdiction?
A deputy general counsel answered for the Department by letter dated April 5, 1979, setting out at some length the bases for the Department's regulatory claim to the high water line in Upper Lake Lafayette.[4] While the response was thorough and informative, it was no more than free-form action, supra fn. 1, not authentic "agency action" either determining Falls Chase's substantial interests or providing the predicate for an APA appeal.
The questions posed by Falls Chase's counsel show his grasp of the matter and his purpose to isolate the agency's legal position, to require its exposition, to expose its errors and excesses. That is to say, Falls Chase knew all it needed to know, on March 21, 1979, in order to write an effective petition for a declaratory statement, subjecting the Department's statutory claims to chapter 120 disciplines and eventually to direct linear review by this Court. Sections 120.565, .68, Fla. Stat. (1979).
Section 120.565 speaks in these terms of declaratory statements:

Declaratory statement by agencies.  Each agency shall provide by rule the procedure for the filing and prompt disposition of petitions for declaratory statements. A declaratory statement shall set out the agency's opinion as to the applicability of a specified statutory provision or of any rule or order of the agency as it applies to the petitioner in his particular set of circumstances only. The agency shall give notice of each petition and its disposition in the Florida Administrative Weekly . .. and transmit copies of each petition and its disposition to the committee. Agency disposition of petitions shall be final agency action. (Emphasis added.)
*805 That the legislature invests declaratory statements with a particular role in the Florida APA scheme, and with particular significance, is evidenced by its use of the imperative "shall" four times in section 120.565: the agencies shall provide by rule for declaratory statements; those declarations shall state the agency's opinion of how a specified statute applies to a particular individual in his particular circumstances; notice of the agency's declaration shall be given the public through publication and to the legislature through the joint Administrative Procedures Committee;[5] and a declaratory statement shall be regarded as final agency action for purposes of a regular section 120.68 appeal to a district court of appeal.
These legislative imperatives lie heavily upon Florida's executive agencies, in marked contrast, for example, to the loosely drawn, loosely enforced parallel section of the federal APA.[6] Section 120.565 allows no room for delay or evasion in the agency's response. Both the model rules of the Administration Commission[7] and the Department of Environmental Regulations's own rules, infra, implement this statute as required.
Even in August 1979, when the Department surveyed the ordinary high water line of Upper Lake Lafayette at "between 44.8 and 46.6 feet mean sea level" and gave a free-form directive that Falls Chase submit permit applications for placing compacted fill below that line, section 120.57 proceedings and a section 120.68 appeal were available to resolve any question of fact, policy, or law inhering in that directive. See section 403.121(2), Fla. Stat. (1979).[8] Questions concerning the Department's lawful powers could also have been raised in any civil action initiated by the Department to enforce its application of chapter 403 in Lake Lafayette. Section 403.121(1).[9] But by the fall of 1979, when Falls Chase launched its preemptive litigation, time was a factor, or at least Falls Chase claimed as much, because it signed a construction contract on June 29, 1979, and mortgage interest, legal fees, and other overhead expenses were accruing.[10] What Falls Chase really needed *806 was an earlier remedy, one designed to answer authoritatively the basic question, Does chapter 403 grant the Department regulatory jurisdiction above the indexed vegetation line to the ordinary high water mark?, before any untoward financial loss or avoidable delay occurred.
Therein lies the special efficacy of a petition for declaratory statement. During the planning stage of a project such as this, before one has signed a construction contract, before schedules begin to pinch, before interest payments on borrowed capital become unduly burdensome, it is possible for someone like Falls Chase to ask an agency like the Department to declare formally the basis for the Department's asserted regulatory powers in the project; the Department must declare; and in rapid order a district court of appeal will remedy any excessive assertion of jurisdiction. Section 120.565 thus provides a broad declaratory remedy, whatever the agency and whatever the issue of statutory application, much like the Division of State Planning's "binding letter of interpretation" which states the application of section 380.06 regional impact standards to proposed developments. See General Development Corporation v. Division of State Planning, 353 So.2d 1199 (Fla. 1st DCA 1977).
The Department's own Rule 17-1.119, regularly published in Florida Administrative Code for a year before spring 1979, fully advertised the prophylactic advantages of the declaratory statement:

Purpose and Use of Declaratory Statement. A declaratory statement is a means for determining the rights of substantially affected persons when a controversy, or when doubt concerning the applicability of any statutory provision, rule or order, has arisen before any wrong has actually been committed. The potential impact upon petitioner's interests must be alleged in order for petitioner to show the existence of a controversy or doubt. (Emphasis added).
In a footnote containing the majority's lone reference to the adequacy of chapter 120 remedies and the principle requiring their exhaustion, there is an unexplained statement that "the availability of this remedy [the section 120.565 declaratory statement] is doubtful" because of the phrase, "before any wrong has actually been committed," in the Department's Rule 17-1.119. Ante, 424 So.2d at 793. I can only assume the majority means by this that because Falls Chase is deemed correct in this dispute, not "wrong," Falls Chase could not have "committed" any "wrong," therefore "[t]he availability of this remedy is doubtful... ." This narrowing of the declaratory statement remedy, preparatory to speculating upon its unavailability, is wholly unwarranted. The phrase seized upon by the majority is but a rendering of common language long used to describe the purpose of declaratory judgment proceedings in circuit court. E.g., Sheldon v. Powell, 99 Fla. 782, 794, 128 So. 258, 263 (1930) (statutory provision for declaratory decree contemplates that the parties "may have a judicial determination of [their rights] before wrong has been committed or damage done."); James v. Golson, 92 So.2d 180, 182-83 (Fla. 1957) (declaratory judgment "may be employed to anticipate irreparable mischief to one's business... ."); Kingdon v. Walker, 156 So.2d 208, 211 (Fla. 2d DCA 1963), cert. den., 165 So.2d 179 (Fla. 1964) ("Thus many disputes may be settled before any party is provoked to hostile action in reliance, perhaps mistakenly, on the validity of his position.") The referenced language simply means that a declaratory statement was available and appropriate as soon as the dispute over the applicability of chapter 403 was recognized, long before any "wrong" in this was committed either by Falls Chase, "wrongfully" filling without a permit, or by the Department, delaying construction with "wrongful" demands for permitting. The declaratory statement remedy, followed by appellate remedies if necessary, was the ideal course to secure a prompt and correct answer to the underlying issue.
The Department had no doubt of the availability of this remedy, nor did Falls Chase. In the Department's motion to dismiss and memorandum of law submitted to *807 the trial court on October 2, 1979, the Department stated:
Plaintiffs have the right to request a declaratory statement from the Department, pursuant to Section 120.565, Florida Statutes. To date, no such petition or request for declaratory statement by Plaintiffs has been received by the Department.
The Department's rules prescribed a simple form of petition. They required the Department to file a responsive order within 60 days, or within 30 days after filing of the transcript of any hearing held subject to section 120.57. Fla. Admin. Code R. 17-1.120, .121. In 1979, but now no longer, Department declaratory statements were subject to review by the Environmental Regulation Commission, section 403.804(1), composed of seven citizens appointed by the Governor and confirmed by the Senate, "representative of, but not limited to, interested groups including agriculture, real estate, environmentalists, the construction industry, and lay citizens." Section 20.261(3), Fla. Stat. (1979). The Commission's rules provided short schedules for appeals from the Department's declaratory statement or other final agency action, and for briefing.[11] The Commission's action was subject, in turn, to section 120.68 appellate review in a district court of appeal. Peterson v. Department of Environmental Regulation, 350 So.2d 544 (Fla. 1st DCA 1977); Booker Creek Preservation, Inc. v. Department of Environmental Regulation, 369 So.2d 655 (Fla. 2d DCA 1979).
Had Falls Chase, Sunshine and Elba pursued this remedy in March 1979, when the dispute arose, this rather clearcut issue over the extent of the Department's regulatory powers on the banks of Upper Lake Lafayette would have been determined administratively or judicially by Labor Day 1979 or, with any luck and a little diligence, by the Fourth of July.

III.

This Court denied prohibition in this case in September 1979 and decided that Falls Chase's administrative remedies were adequate; that decision has res judicata effect.

The majority opinion, while speaking the language of jurisdiction, really decides the merits, that is to say, the extent to which chapter 403 restricts dredge-and-fill in an historic lake that is subject to periodic flooding and draining and has drained in recent decades, inviting growth below its ordinary high water line of vegetation not tolerant of water. Given the legislature's comprehensive declaration against the menace of pollution in Florida's lakes and other waters, section 403.021, and its equally comprehensive delegation of responsibility to the Department, section 403.061, the Department certainly has "jurisdiction," in any ordinary sense of the word, to decide the issue; and chapter 120 dictates how the agency shall decide, subject to judicial review by appeal. One could correctly say that the Department of Education or the Department of Highway Safety and Motor Vehicles had no "jurisdiction," but this Department's jurisdiction in enforcing chapter 403, and in determining its application in the first instance, is too obvious to be labored further.
The majority says in effect that the Department has jurisdiction to apply chapter 403 correctly but is "without jurisdiction" to apply chapter 403 incorrectly or in a way that a circuit judge deems not "colorably" correct. But if this reasoning were thought to justify judicial intervention notwithstanding adequate chapter 120 remedies to correct any Department error not "colorably" correct, this Court would surely have granted the petition of Falls Chase, Sunshine and Elba for a writ of prohibition, filed August 28, 1979. But the Court denied the petition, without requiring a response *808 by the Department, on September 6, 1979. Fallschase Special Taxing Dist. v. Department of Environmental Regulation, No. PP-106 (Fla. 1st DCA 1979) (Judges McCord, Mills and Ervin).
Falls Chase's petition for writ of prohibition was virtually identical to its later circuit court complaint; it substantially differed only in that the petition for prohibition did not contain specific allegations, added when the complaint was filed on September 11, 1979, that administrative remedies had been refused or were for specific reasons inadequate. The petition for writ of prohibition was therefore strikingly like the majority opinion, arguing that the Department was wrong, egregiously wrong, in asserting by free-form action that chapter 403 applied to Upper Lake Lafayette in the circumstances of this case. Thus the allegations of the petition for writ of prohibition and those of the complaint later filed in circuit court may be compared:
Allegations in the developers' petition for writ of prohibition:
10. The choice of an historical ordinary high water line in what is, for all practical purposes, a dry basin, as the basis of establishing the landward extent of jurisdiction for regulatory purposes is contrary to Florida Statutes and Department regulations.
16. The Department itself admits that under the jurisdictional limit placed by the vegetation index rules none of the work being done by Petitioner District or upon Petitioner corporations land is within Department jurisdiction.
18. Despite the legislative mandate and the Department's own rules the Department has arbitrarily and capriciously attempted to stop all work by the District below a line far landward of the landward extent of its jurisdiction under Chapter 403, Fla. Stat. and Chapter 17-4, F.A.C.
21... . Thus, under the Department's own definition it has no jurisdiction over Petitioner's use of its land.
28. Petitioners contend that the attached exhibits... clearly indicate that Respondent has acted and threatens to continue to act without or in excess of jurisdiction granted to it by either the Florida Constitution or the Florida Statutes, all to the continued and irreparable damage of Petitioners. Judicial review is necessary immediately because review of the final decisions of Respondent would be too late and would not provide an adequate remedy.
WHEREFORE, Petitioners request this Court to issue its rule nisi ... and thereafter to grant the writ and prohibit Respondent from further purporting to exercise jurisdiction to control use of Petitioners' property ... contrary to statutory and regulatory mandate....
....
Allegations in the developers' complaint for declaratory judgment and injunctive relief:
6(h). The ordinary high water line which the agency is selecting as its jurisdictional boundary is not authorized by statute, is not authorized by regulation, and is in fact, a historical line without any basis in fact to the actual water line in the area in which the land is being developed. The land is now dry, and has been used for years for farming and cattle grazing.
6(i). The Department has no legal authority for its attempted exercise of jurisdiction over the Plaintiffs in the development of private property.
6(m). The use of the so-called ordinary high water line by the Department is an arbitrary and capricious use of a standard which has not been adopted as a rule and is in fact contrary to the rules and statutes governing the landward extent of waters for the regulatory purposes of pollution control... .
6(t). The actions of the Department, being without statutory authority ... requires intervention by this Court.
6(u). The activities of the Defendant Department demonstrate a gross and flagrant *809 abuse of power contrary to the power delegated to it by the legislature.
WHEREFORE, Plaintiffs pray that this Court will enter a declaratory judgment declaring that the landward extent of the [Department's] jurisdiction for regulatory purposes under Chapter 403, Fla. Stat., is limited to the edge of the wetland vegetation... .
It is further requested that the Court enter a preliminary injunction and a permanent injunction against the Department preventing the Department, its agents and employees, from attempting to regulate the activities of the Plaintiffs upon land not within the jurisdiction of the Department... .
Thus on essentially the same allegations as are contained in the circuit court complaint  putting aside the complaint's added allegations concerning inadequate and unavailable chapter 120 remedies  another panel of this Court summarily denied Falls Chase's petition for writ of prohibition. That writ is altogether appropriate to prevent an inferior tribunal from acting in excess of jurisdiction "where person seeking writ has no other appropriate and adequate legal remedy." English v. McCrary, 348 So.2d 293, 297 (Fla. 1977). That being so, the Court's denial of the writ establishes either that the Department was acting within its jurisdiction or that Falls Chase had adequate remedies for any excessive regulation under chapter 120. In either case that decision controls this one, on principles of res judicata.
In support of its position that this Court's denial of the writ of prohibition was inconsequential, ante, 424 So.2d at 790, the majority opinion cites decisions establishing that this Court's action was very consequential indeed. State ex rel. Washburn v. Hutchins, 101 Fla. 773, 777, 135 So. 298, 299 (1931), characterized prohibition as
an extraordinary judicial writ that in proper cases may be issued to restrain the unlawful exercise of judicial functions when no other adequate remedy is afforded by law. (emphasis added.)
And Public Employees Relations Commission v. District School Board of De Soto County, 374 So.2d 1005 (Fla. 2d DCA 1979), cert. den., 383 So.2d 1193 (Fla. 1980), interpreting English v. McCrary, held that the writ is appropriate only "where the person seeking the writ has no other appropriate and adequate legal remedy... ." For that reason, the court stated,
denial of a writ of prohibition without opinion is not res judicata unless the sole possible ground of the denial was that the court acted on the merits of the jurisdictional question, or unless it affirmatively appears that such denial was intended to be on the merits.
Thus the Second District held, concerning two prior denials of prohibition by prior panels of that court, that "those denials could have rested on reasons other than the merits of the jurisdictional question posed in those prior proceedings." 374 So.2d at 1010.
Certainly I would not claim that this Court's summary denial of Falls Chase's petition for writ of prohibition decided the extent of the Department's regulatory "jurisdiction" in this controversy. On what other ground, then, could the decision have rested? None other than that Falls Chase had not shown it lacked adequate chapter 120 remedies for any "jurisdictional" error the Department may have committed, or threatened to commit, by the free-form action complained of. If the Court's action is not explained on that ground, there is no other explanation except judicial caprice, which I am unwilling to assume.

IV.

Concerning Falls Chase's allegations in circuit court that APA remedies had been refused or were for specific reasons inadequate.

Falls Chase and the developers rightly interpreted this Court's summary denial of prohibition on September 6, 1979, as requiring them to exhaust administrative remedies or to show their inadequacy in fact. Thus their injunction complaint filed September 11 alleged that chapter 120 remedies *810 were unavailable because the Environmental Regulatory Commission, overseer of the Department, had on August 23, 1979, "refused to consider whether the Department had legal jurisdiction under the above-alleged facts, and its chairman suggested relief could best be found in the courts"; and that APA remedies were inadequate because in September 1979 "[d]ue to the extreme time constraints of the Plaintiff District for the purposes of construction schedules and payment to contractors the administrative remedies available under Chapter 120 ... are clearly too little and too late."
Subject to its motion to dismiss for failure to exhaust APA remedies, the Department filed an answer denying those allegations. Those allegations were never proved and the record disproves them. These disputed factual issues are not mentioned in any order of the circuit court, nor in the judgment entered on the pleadings.[12] A judgment on the pleadings is, of course, inappropriate in a case bearing unresolved factual issues. E.g., Miller v. Eatmon, 177 So.2d 523 (Fla. 1st DCA 1965).
Concerning the complaint's allegation that by September 1979 "extreme time constraints" under the construction contract rendered "administrative remedies available under Chapter 120 ... clearly too little and too late," there was no evidentiary hearing in circuit court nor any findings of record concerning the developers' claim that they would have been financially devastated should they be required, in September 1979, to seek administrative remedies.[13] But vastly more important than that, there was no allegation, no proof, no finding, nor even any argument of record explaining and excusing the failure of Falls Chase, Sunshine and Elba to ask the Department for a decisive (and judicially reviewable) declaratory statement on the issue six months earlier, in March 1979, when the issue arose in free-form proceedings. That was three months before Falls Chase even signed the construction contract that created the "extreme time constraints" in September. Thus, insofar as they were relied on to show the inadequacy of chapter 120 remedies, any "extreme time constraints" in September when the complaint was filed, or in November when the judgment was entered, were without significance. One cannot by neglect and delay dissipate an ordinary APA remedy and then complain of its loss as the basis for claiming an extraordinary judicial one. Willis, 344 So.2d at 592-93; Holman v. Florida Parole and Probation Commission, 407 So.2d 638 (Fla. 1st DCA 1981). "No rule is better settled," it is said, "than that equity aids the vigilant and not the indolent." Lanigan v. Lanigan, 78 So.2d 92, 96 (Fla. 1955).
Concerning the developers' allegation that no APA remedy was available because the Environmental Regulatory Commission "refused" to decide the extent of the Department's jurisdiction, the proof amounts to this: On May 22, 1979, Clean Water, Inc., and Terri Saltiel, citizens interested in preserving Leon County's lakes and other waters, petitioned the Department for an opportunity to oppose, in a section 120.57 hearing, Falls Chase's dredge-and-fill plans in the Lake Lafayette basin. The Department denied the petition on technical grounds and the petitioners appealed to the Environmental Regulation Commission. On August 23, the Commission granted the motion jointly filed by the Department and Falls Chase to dismiss the appeal as untimely.[14] *811 In dismissing the appeal the Commission said it had no jurisdiction to decide other questions raised, such as the extent of the Department's regulatory power in Lake Lafayette:
Since the Appellants have suffered a dismissal of their appeal on the grounds that the Notice of Appeal was not timely filed, this Commission is without further jurisdiction and has no right to render any judgment either in favor of or against the Appellants. Lester v. State (1896), 37 Fla. 382, 20 So. 232; Seaboard A.L.R. Co. v. Ford, 92 So.2d 160 (Fla. 1955); Lightsee v. First National Bank, 132 So.2d 776 (Fla. 2d DCA 1961).
Therefore, this Commission shall make no further inquiry or determination of other questions or motions presented by the parties to this appeal or by Sunshine Land Development, Inc. and Elba, Inc.
The Commission was unquestionably correct in refusing to rule on other questions when dismissing the appeal for lack of jurisdiction. The Falls Chase allegation that the Commission "refused" to supply it an appropriate APA remedy on that occasion must be regarded as frivolous.
Though no mention was made of it in any pleading, Falls Chase put another APA order in the circuit court file, evidently as further proof that it had been "refused" an appropriate APA remedy. That was the September 24, 1979, order of hearing officer Tremor of the Division of Administrative Hearings, granting Falls Chase's motion to dismiss another APA appeal by Clean Water, Inc. and Saltiel, from the Department's "proposed order" stating its intention to issue the water system permit. The hearing officer considered that not a final order, and not appealable. Granting Falls Chase's motion to dismiss on that procedural ground, the hearing officer did not reach other grounds, including a fifth ground added late in August that "dredge and fill permitting jurisdiction cannot be determined by an ordinary high water line test instead of the vegetative indicators/vegetative index adopted by the Florida Legislator and the Environmental Regulation Commission."
Thus attempting to demonstrate that it had been "refused" chapter 120 proceedings to determine the applicability or inapplicability of chapter 403 to its filling at Upper Lake Lafayette, Falls Chase placed two administrative orders in the record of the circuit court proceedings: one was an order dismissing, on Falls Chase's motion, an untimely administrative appeal by third parties from a Department order favorable to Falls Chase; the other was an order dismissing, again on Falls Chase's motion, yet another third party administrative appeal from a nonappealable "proposed order" of the Department that was, again, favorable to Falls Chase. It is ludicrous to characterize this action as repeatedly refusing Falls Chase appropriate chapter 120 remedies on the substantive issue Falls Chase took to circuit court.
The utter absence of justification did not deter Falls Chase, either in the circuit court or here, from bitterly complaining, in terms selected for incitement value, of a Departmental strategy to refuse or evade chapter 120 proceedings for a decisive Department order that would be subject to immediate review.
In circuit court the arguments of Falls Chase and the developers hammered at "the incredible delay the Department has already inflicted upon Plaintiffs" (memorandum filed November 13, 1979, pp. 3-4). The point was made unrelentingly: "In the cases in which the jurisdictional issue has *812 been raised, DER has been successful in obtaining rulings which avoid the issue," (Id. at 6), "placing Plaintiffs in an eight month run-around" (Id. at 6); "Plaintiff, Falls Chase, has repeatedly attempted to find someone to hear its jurisdictional question"; "What [the Department] suggests here is that a legal decision by a court be put off until the total destruction of the Plaintiffs and Plaintiffs' legal problems thereby disappear" (Id. at 9); "What DER has attempted to do is forestall any decision on its unlawful creation of dredge and fill jurisdictional limits until the Plaintiffs literally die" (Id. at 10); "the Department's acts in changing its position as to what its staff `thinks' its jurisdiction is, and indecision, ... has forced Plaintiffs to the brink" (Id. at 14).
These denunciations continued in appellees' brief filed in this Court April 5, 1980: "Thus, for four months DER did not have even a belief of what its regulatory jurisdiction was, holding all development in question for a third of a year while it attempted to make up its collective mind" (p. 5); "the DER wanted [Fallschase] to wait several more months so it could set the so-called jurisdictional line... ." (p. 11); "It is further alleged that the Environmental Regulatory Commission ... specifically refused to consider whether the Department had legal jurisdiction in an action in which that question was one of the issues raised" (p. 13); "What DER has attempted to do is forestall any decision on its unlawful creation of dredge and fill jurisdictional limits until the Appellees literally die" (p. 22); "It is identical to the situation with which Joseph K. was faced in his search for justice in Kafka's unfinished novel, The Trial" (p. 22).
All this from litigants to whom section 120.565 and the Department's rules offered a clearly effective remedy from March 1979 onward, requiring nothing but a request from Falls Chase. "To date," the Department's motion to dismiss rightly told the circuit judge on October 2, 1979, "no such petition or request for declaratory statement ... has been received... ." Obtaining a declaratory statement, like obtaining other APA remedies, is "simplicity itself." One "asks the agency for it." Willis, 344 So.2d at 592. Since Falls Chase and the developers strategically did not "ask," they of course did not receive.

V.

Commending the exhaustion principle, once again, to the 
judiciary.
Five years have passed since Willis surveyed the disciplines imposed by chapter 120 on agency decisionmaking and called for "judicial freshening of the doctrines of primary jurisdiction and exhaustion of remedies, and greater judicial deference to the legislative scheme."[15] Since Willis this Court and others, and indeed this Department and other agencies, have fulfilled the implicit promise of Willis that chapter 120 disciplines would be honored by the agencies or else enforced by the district courts of appeal on linear appeals through section 120.68. It was clear enough, in 1977, that agencies would be held to exacting standards in formulating their declaratory statements and in other actions determining the substantial interests of affected persons. McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977). Numerous decisions since then have fulfilled the promise on which Willis predicated "judicial freshening" of the exhaustion principle.
That being so, there is no basis in Florida's unique APA experience for a skeptical assumption that the agency's free-form arguments show that chapter 120 processes would be "futile," nor is there cause for a judicial attitude "so skeptical of the agency's purposes or capabilities that judicial intervention becomes necessary in order to secure the basic rights of the affected parties." Ante, at 797 n. 24. There is no longer room for judicial skepticism that "[t]he agency will not change its collective `mind' short of ruling by this court" or some other. Rice v. Department of Health and Rehabilitative *813 Services, 386 So.2d 844, 854 (Fla. 1st DCA 1980) (dissenting opinion). That agencies do change their minds under chapter 120 disciplines is evident. See, e.g., that salutary event in the Rice matter, Key Haven Associated Enterprises, Inc. v. Board of Trustees of the Internal Improvement Fund, 400 So.2d 66, 73, n. 15 (Fla. 1st DCA 1981). See also Communities Financial Corp. v. Florida Department of Environmental Regulation, 416 So.2d at 815, where this very Department "changed its mind" in chapter 120 proceedings and found its own proof inadequate to show that "the dredging and filling activities of CFC in constructing the drainage system took place in waters of the state subject to DER's jurisdiction." The opportunity to "change the agency's mind" is one of the highest achievements of chapter 120 disciplines, and the courts have repeatedly required agencies to afford that opportunity. We did so most recently in International Medical Centers, H.M.O. v. Department of Health and Rehabilitative Services, 417 So.2d 734 (Fla. 1st DCA 1982).
If judicial skepticism about the efficacy of chapter 120 processes is not at the root of the majority's decision to jettison the exhaustion requirement, then the only possible purpose, in practical terms, must be to avoid through judicial intervention the expenditure of litigants' time and money in administrative proceedings. Thus the majority cites Falls Chase's "injury from the pursuit of administrative remedy in the instant case," consisting of "time and expense" and "the inability of appellees to make use of their property due to the agency's assertion of regulatory jurisdiction... ." Ante at 796.
The first point to be made in commending the exhaustion requirement, therefore, is that the alternative of circuit court intervention, followed by an appeal to determine its propriety by the majority's standards, contradicts the majority's stated concern for economy and swift judicial decisions.

A. Preemptive circuit court litigation will cost, not save, time and money, and that expenditure may well be futile.

Part II of this opinion suggested that conventional chapter 120 remedies, if resorted to by Falls Chase, would have resolved this controversy fairly and finally by Labor Day 1979. Because Falls Chase resorted to this injunction suit instead, and the circuit court entertained it, the question of Falls Chase's entitlement to dredge and fill below the ordinary high water mark in Upper Lake Lafayette became freighted with the exhaustion question to which these opinions, filed in July 1982, are principally addressed.
Even though the circuit court's judgment rendered November 26, 1979, enjoined the Department from further attempts to regulate dredge and fill above the indexed vegetation line at Upper Lake Lafayette, Falls Chase did not assume that it could then safely proceed with the intended construction. The Department's appeal on November 28 effected an automatic stay of the injunction pursuant to Fla.R.App.P. Rule 9.310, so Falls Chase applied to the circuit court to vacate the stay, and the court did so. Even then Falls Chase's doubts were not assuaged. As late as May 17, 1982, counsel for Falls Chase and the other appellees wrote to the Court, with copies to opposing counsel, calling attention to the "acute financial distress" his clients were suffering because of the time required for this Court's decision and "the continuing cloud over the use of their property... ."
The cause of added expense, delay, and uncertainty in this case has been the length of time this Court has required to formulate and debate, through these opinions, this radical departure from Florida precedent and practice under the APA. In future cases the cause of added expense, delay, and uncertainty will be the majority's test for authorizing, or not, preemptive circuit court litigation. Because the majority places a premium on "the degree of apparent clarity or doubt about administrative jurisdiction" and on whether the agency's free-form claims are "colorable" or not, ante at 796, *814 every appeal from a circuit court preemptive injunction will require a district court's subjective assessment of a circuit judge's subjective assessment of "the degree of apparent clarity or doubt" involved in the substantive question. While the parties wait, the appellate court will debate, not whether the agency was right or wrong, but whether the agency's free-form position was "colorable."
Presumably the appellate court will structure its decision as the majority has structured its: first decide the substantive question in the conventional way; then, if that decision is contrary to the agency's free-form position (which may or may not be identical to arguments advanced for the agency in the litigation), proceed to determine whether the agency's position was nevertheless "colorable"; if so, reverse the injunction and remit the parties to chapter 120 remedies now rendered moot by the court's declaration of the law independently of "colorable" considerations; if not, affirm the injunction. And if the court's conventional analysis of the substantive question upholds the agency's free-form position (or its appellate arguments), leave off considering "the degree of apparent clarity or doubt" in that correct position, reverse the injunction judgment, and require exhaustion of chapter 120 remedies. Or shall those remedies then be held, for obvious reasons, unnecessary? In that event APA processes are subverted as surely as when the agency's free-form position is found not "colorable."
These unruly and subjective judgments on "the degree of apparent clarity or doubt," with all their bizarre results, will range as widely as the personalities of Florida's ranks of circuit and appellate judges. How this uncertain process can be preferred over straight-forward and expeditious chapter 120 remedies, in the name of saving time and money, is beyond my comprehension.
But of course the district courts of appeal have it in their power to fulfill the majority's expectations of saving litigants time and money, and freeing up their interests, by preemptive circuit court litigation; the district courts need only abdicate entirely their role as agency overseers under section 120.68, and uncritically affirm, as summarily as possible, every circuit court injunction.

B. The majority's exhaustion test, modeled after inappropriate federal law, preempts the district courts of appeal and nullifies section 120.68 appellate remedies.

The majority's exhaustion test contains undeniable and perhaps irresistible pressures upon the district courts of appeal, whose stewardship of section 120.68 remedies has created healthy initiatives in the executive branch, to abdicate their statutory role. If the controlling issue on these appeals is now to be whether a circuit judge rightly deemed the agency's free-form position to be not "colorably" correct under the law, the drift toward discretionary circuit court preemption is well established. The district courts will not long act in the charade of finding circuit courts right in statutory interpretation but wrong on what is "colorable," and so wrong in preempting APA processes that as a result of litigation have become both stale and moot.
Sensing this, parties who strategically prefer circuit court litigation to chapter 120 processes will have no difficulty in framing their attacks on agency free-form action, addressed to the merits of questions properly before the agency, in "jurisdictional" terms.
For example, the cases in the following list were either decided by a district court of appeal on section 120.68 appeal, after agency action, or were required by the district court to be submitted to chapter 120 agency action instead of litigated in circuit court. Consider how readily the issues could have been pleaded in circuit court in a manner exploiting the majority's license for circuit court preemption:

ABC Liquors, Inc. v. Department of Business Regulation, Division of Alcoholic Beverages and Tobacco, 397 So.2d 696 (Fla. 1st DCA 1981). Hypothetical circuit court allegation: Because section 565.02 *815 authorizes an additional tax only if the licensee has "more than three permanent separate locations serving alcoholic beverages for consumption on the licensed premises," the Department threatens to act in a way not colorably within its jurisdiction by assessing the tax on four locations in the same room.

Anheuser-Busch, Inc. v. Department of Business Regulation, Division of Alcoholic Beverages and Tobacco, 393 So.2d 1177 (Fla. 1st DCA 1981). Hypothetical circuit court allegation: Because section 561.42(1) prohibits only "the giving of a gift, loan of money or property or the giving of a rebate," the Department threatens to act in a way not colorably within its jurisdiction by charging that the brewer illegally bought beer for bar customers.

School Board of Leon County v. Mitchell, 346 So.2d 562 (Fla. 1st DCA 1977). Hypothetical circuit court allegation: Because a statute granted her tenure, the Board threatened to act in a way not colorably within its jurisdiction by abolishing Mitchell's position.

Harris Corp. v. Department of Revenue, 409 So.2d 91 (Fla. 1st DCA 1982). Hypothetical circuit court allegation: Despite the clear statutory limitations period on sales tax assessments, the Department threatens to act in a way not colorably within its jurisdiction by assessing taxes barred by the statute.

State of Florida, Department of Citrus v. Office of the Comptroller and Department of Banking and Finance, 416 So.2d 820 (Fla. 2d DCA 1982). Hypothetical circuit court allegation: Despite a clear statutory exemption, the Department of Banking and Finance threatens to act in a way not colorably within its jurisdiction by withdrawing two percent of the Department of Citrus' interest income for use as general revenue.

School Board of Nassau County v. Arline, 408 So.2d 706 (Fla. 1st DCA 1982). Hypothetical circuit court allegation: Despite a clear contractual provision excusing a teacher's failure to perform her contract "by reason of personal illness," the Board threatens to act in a way not colorably within its jurisdiction by threatening to dismiss her because she has tuberculosis. Allis-Chalmers Credit Corp. v. State Department of Revenue, 408 So.2d 703 (Fla. 1st DCA 1982). Hypothetical circuit court allegation: Despite the clear statutory application to "Florida sales," the Department threatens to act in a way not colorably within its jurisdiction by assessing an income tax on transactions that took place in Atlanta.

General Development Corp. v. Division of State Planning, Department of Administration, 353 So.2d 1199 (Fla. 1st DCA 1977). Hypothetical circuit court allegation: Despite a clear exemption under the statute, recognized previously by the Division, the Division threatens to act in a way not colorably within its jurisdiction by threatening regulation of plaintiff's exempt land as a development of regional impact.

Metropolitan Dade County v. Department of Commerce, 365 So.2d 432 (Fla. 3d DCA 1978). Hypothetical circuit court allegation: Despite clear statutory exclusions, the Department threatens to act in a way not colorably within its jurisdiction by assessing the County for unemployment compensation contributions not required by the statute.
The model complaint seeking circuit court intervention will of course allege, further, that "the facts," meaning the facts complainant considers the operative facts, "are essentially undisputed." Majority opinion ante at 789. Thus, if this case is any example, the circuit court is to be drawn into the merits of the dispute  impelled, perhaps, by such groundless and now inoperative allegations as Falls Chase made concerning the Department's refusal of administrative remedies  despite a motion to dismiss for complainant's failure to exhaust available administrative remedies, and despite any doubts the judge may initially express concerning intervention (a Falls Chase memorandum of record lamented that Judge Miner "seemed persuaded that a complicated question existed").
*816 It is unclear when the circuit court in this case announced denial of the Department's motion to dismiss filed October 2, 1979, since the only written order on that subject is the final judgment itself, filed November 26, 1979, reciting that the motion "was previously denied in open court." In the intervening period numerous presentations were received by the court on the merits: the Department's answer was filed October 5, 1979, accompanied by a letter from Mr. Cole, the Department's deputy counsel, saying the answer was filed "even though it is not required at this time since a Motion to Dismiss is presently pending," because of and "[i]n order to comply with Judge Miner's request to expedite the case"; on October 11, Falls Chase moved to amend its complaint to incorporate additional factual material, and the court granted that amendment on November 13, 1979, "10/30/79 nunc pro tunc"; the court received several other memoranda arguments; the court conducted a hearing on Falls Chase's application for preliminary injunction; and the court conducted a final hearing producing the final judgment which recited that "counsel for the parties to this dispute agree that what the Court believes to be the threshold issue framed in the pleadings is now ripe for determination."
In other words, first before and then after orally denying the Department's motion to dismiss at some unidentified time, the circuit court explored the merits of the dispute repeatedly and in depth, gathering additional facts in the process, pressing the Department's counsel to expedite the case by pleading to the complaint while the motion to dismiss was yet pending, and finally announcing that counsel agreed that "the threshold issue... is now ripe for determination." At the time the "judgment on the pleadings" was entered, these loose ends still appeared in the pleadings:
The complaint as amended alleged in paragraph 3 that appellees Sunshine and Elba own a majority of the land in the District. The Department answered that it was without knowledge of that, so effectively denied that allegation. Fla.R.Civ.P. 1.110(c). The "judgment on the pleadings" found as a fact, as has this Court, that Sunshine and Elba own a majority of the land in the District.
The complaint alleged in paragraph 6(a) that Upper Lake Lafayette is and has been for 20 years separated from Lake Lafayette by dams. The Department's answer denied this allegation insofar as it implied that Upper Lake Lafayette "is not a lake and is not a part of Lake Lafayette." Since the complaint contained no allegation that Upper Lake Lafayette is not navigable, the latent issue of sovereignty lands was never explored in the circuit court's two-month process of warming to the merits of the case. The November 26 final judgment recites:
Neither party has asserted that the lake is navigable and subject to regulation under Chapter 253, Florida Statutes, and the state's sovereignty powers as Trustees for submerged lands of navigable water bodies.
This finding becomes, in the majority opinion, ante at 789,
It is stipulated by the parties that there are no sovereignty lands involved in this dispute.
Paragraph 6(c) of the complaint alleged "All of the work being done by Plaintiff District upon private property, including Plaintiff corporations' land, is on `uplands' according to rules of the Defendant Department." This allegation the Department denied. Yet the circuit court's "judgment on the pleadings" accepted the allegation as true, as does this Court. [Notice how agencies are moved to adversariness when they are required to state their positions through lawyers in circuit court rather than by declaratory statements or orders, signed by agency heads, in chapter 120 proceedings. The Department had freely conceded in free-form proceedings with Falls Chase, during the previous winter, that there was no indexed vegetation where Falls Chase sought to fill Upper Lake Lafayette. In circuit court, of course, the Department was entitled to put Falls Chase to proof.]
*817 Thus it is seen how the agency, asserting all the while that no basis for preempting the administrative process has been shown, may incrementally be required to state in circuit court the factual basis for its free-form position or else be held bound in a paper trial by unpleaded or unproved factual assertions of a party seeking circuit court preemption of chapter 120 processes.
This kind of thing is inevitable, I submit, when the exhaustion question is no longer whether adequate chapter 120 remedies are available, and when the circuit courts are asked instead to form a subjective impression of "the degree of apparent clarity or doubt" about the extent of the agency's regulatory power. And after such a serial trial as this, ostensibly conducted "on the pleadings" over a two-month period, it cannot be supposed that the district courts of appeal will seriously regard the futile role the majority opinion reserves for them, to reverse circuit court injunctions where the agency's free-form position is thought to be "colorable," and to require exhaustion of chapter 120 remedies, even if the circuit court's judgment is deemed substantially correct as a matter of statutory construction. Thus, circuit court discretion in assessing "the degree of apparent clarity or doubt" inevitably reigns supreme, and Professor Davis' grim assessment of federal law applies as well to Florida's heretofore honored and still unimpeached exhaustion principle. K. Davis, Administrative Law Treatise § 20.11 at 279-80 (1982 Supp.):
Since 1975 the [federal] law of exhaustion has become even more disorderly than it previously was. The lack of predictability is strong enough to raise the question whether the requirement is governed by discretion rather than by law.
In this milieu the circuit court displaces the district court of appeal in effective control of agency action, and since the action to be reviewed is free-form only, by a court having no direct access to chapter 120 remedial processes, there is no place for the delicate touch to which the district courts have become accustomed, promoting agency responsibility and sensitivity through McDonald devices as they have evolved these past five years  orders for rulemaking, for expository orders by agencies, for creating a record foundation. There is, instead, only the extraordinary and blunt-edged writ of injunction to desist.
Now it is clear why, for two distinct reasons, the indigestable federal exhaustion law, whether or not warmed over by national textbook writers who know no other source of law, should not be swallowed by Florida courts. First, as indicated ante n. 6, federal law is handicapped by the absence of a reliable declaratory statement remedy, available as of right in section 120.565 to resolve questions of statutory applicability (or, as the majority prefers, agency "jurisdiction") long before anyone is damaged or delayed by free-form action. And second, federal law disperses judicial responsibility to review administrative action willy-nilly, on a statute by statute basis, to various United States district courts and to the courts of appeal. Thus 5 U.S.C. § 702 ("Right of review") provides:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof... .
And 5 U.S.C. § 703 ("Forum and venue of proceeding") provides:
The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.
The federal condition, as regards choice of forum for judicial review, is therefore much like Florida's condition before 1974, when the legislature repealed or replaced "the baffling array of disparate statutes" providing judicial review "by various means in various courts," and replaced that disharmony with uniform and comprehensive review in the district courts of appeal. Willis, *818 344 So.2d at 587-88. Compare Currie and Goodman, "Judicial Review of Federal Administrative Action: Quest for the Optimum Forum," 75 Colum.L.Rev. 1, 3 (1975):
The aim of this Article [88 pages] is to explore the considerations that determine which federal administrative actions are best reviewed by the district courts, which by the courts of appeals, and which by separate courts of administrative review.
Compare also note, "Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals," 88 Harv.L.Rev. 980 (1975):
Sometimes such review can be obtained initially in a court of appeals and in other cases in a district court. Uncertainty as to which forum is proper may cause a litigant to seek review in the "wrong" court. This Note explores... .
Small wonder, then, that there are few incentives for federal courts to discipline themselves through a meaningful exhaustion requirement: federal litigants do not have access as of right to declaratory statements and other "varied and abundant remedies for agency error," Willis, 344 So.2d at 590, contained in chapter 120; and because it makes little difference in the overall scheme of federal law where agency action is reviewed, it makes even less difference when and how it is reviewed. Contrast section 120.68. If preserving Florida's exhaustion rule were not compelled by reason, preserving it would be compelled by pride.

C. The majority's decision encouraging preemptive circuit court litigation also encourages forum shopping among the circuits.

This preemptive litigation occurred in Leon County because Upper Lake Lafayette is there and the Department is head-quartered there. But given a plaintiff's choice from among appropriate venues and the "sword wielder" doctrine[16] that allows local circuit litigation by one whose locally based interests are considered imminently threatened from Tallahassee, the shopping list of fora for preemptive circuit court litigation against an agency is lengthened to include any of Florida's 20 circuits. Correspondingly the range of discretion inevitably invoked by the question, "degree of apparent clarity or doubt," is as broad as the discretion of any of Florida's 300 circuit judges.
Forum shopping is not a privilege reserved to those who like their chances better in one circuit court or another. Others having party status, which Saltiel and Clean Water, Inc., sought in this case, may in their own interests prefer conventional chapter 120 processes. So when parties of different persuasions are involved, there follows an unseemly race and wasteful litigation to decide which foothold has been established first or best. Again the federal system is a striking and distressing model for the litigation fomented by the majority. See McGarity, "Multi-party Forum Shopping for Appellate Review of Administrative Action," 129 U.Pa.L.Rev., 302, 305 (1980) (describing "wild and often bizarre races to the courthouse.")
The supreme goal of the Administrative Procedure Act of 1974 is increased initiative and self-discipline within the executive branch. All its remedies press toward that goal, as McDonald and its progeny make clear. When as here those remedies are preempted that goal is the first and most important casualty. Where chapter 120 promotes agency responsibility, changing the agency head's mind if that is indicated, we have seen that collateral litigation values instead the polarized position, the fixed stance. For litigation to justify itself on the dour assumption, expressed or implied, that the agency "will not change its mind" in APA proceedings, describes the inevitable condition of litigants, not the experience of agencies under chapter 120. For collateral litigation to justify itself on the pretense of saving time and money, when litigation *819 gulps both more time and more money, to vastly more uncertain ends, is judicial self-deception.
The case may one day come when the judiciary shall have cause to doubt the efficacy of chapter 120 remedies and the exhaustion principle. Florida's firm commitment to the efficacy of those remedies is, in a sense, a new idea, one that thus far has yielded a generous harvest. In time it too may be required, in turn, to give way. As poet and critic W.D. Snodgrass wrote,[17]
That is understandable. We have done much magnificient theorizing about the world; the world remains a mystery. Man may become extinct, tyranny may prevail, your business fail, your wife leave you, tomorrow. There is a strong possibility that no idea works all the time. All the ideas carry guarantees, of course; the only trouble is that nobody knows where you go to get your money, or your life, back. This terrifying possibility that no idea always works is suggested every time someone offers us a new fact or a new idea.
Conceding the uncertainties of the future, I am firmly of the opinion that this case offers us no new fact or new idea worthy of supplanting the exhaustion principle. I would reverse the circuit court, and I therefore respectfully dissent.

ON PETITION FOR REHEARING EN BANC
PER CURIAM.
The Court considered this case en banc, Fla.R.App.P. 9.331, upon a majority vote that en banc consideration is necessary to maintain uniformity in the decisions of the Court respecting the requirement of exhaustion of administrative remedies. Upon consideration of the matter, the Court was evenly divided. Judges Mills, Booth, L.G. Smith, Shaw, Joanos and Thompson voted in favor of affirming the circuit court. Chief Judge Robert Smith and Judges McCord, Ervin, Shivers, Wentworth and Wigginton voted in favor of reversing. The effect of the vote is that the panel decision stands. In Re Rule 9.331, Determination of Causes by a District Court of Appeal En Banc, Florida Rules of Appellate Procedure, 416 So.2d 1127 (Fla. 1982).
MILLS, Judge, specially concurring:
I wish to state clearly my position in this case. I am of the opinion there is no conflict between this case and the Willis case, 344 So.2d 580 (Fla. 1st DCA 1977); therefore, en banc consideration was unnecessary.
Upon en banc consideration, I voted not only to affirm the trial court, but I voted to adopt the panel's decision and its reasoning in affirming the trial court.

ON MOTIONS FOR REHEARING AND TO STRIKE
ROBERT P. SMITH, Jr., Chief Judge, concurring and dissenting.
I dissent from the order denying the Department's motion for rehearing. I concur in the order granting Falls Chase's motion to strike the rehearing motion of Terri Saltiel, whom we earlier recognized as an intervenor below and therefore a party here. In fact Saltiel is not a party; we are told that the circuit court orally denied Saltiel's motion to intervene. We had assumed from the silent record that Saltiel's motion had been granted on the strength of her allegations that she owns riparian land on Lake Lafayette, uses the lake for recreation and education, opposes the "destruction and elimination" of the lake by dredge and fill, and was previously accorded party status in chapter 120 proceedings affecting this controversy.
It is Saltiel's own motion for rehearing, filed by her exercising the party status we erroneously extended to her, that tells us she is not a party. By that motion, an unsophisticated document she evidently prepared *820 without a lawyer, Saltiel contests the panel majority's threshold statement, "The facts are essentially undisputed"; she tenders to us a map of Lake Lafayette, which this record lacks; and she offers color aerial photographs "clearly showing," she says, "Falls Chase's red clay fill in the blue waters of Lake Lafayette." The motion further states:
If Clean Water, Inc. and Terri Saltiel had been permitted to intervene, they would have submitted pleadings (since Judge Miner would not allow any testimony to be presented in his court and no evidentiary hearing was ever held in his court) strongly conflicting with Falls Chase, et al. The facts in this case are very much in dispute.
Since we have no reason to doubt what Saltiel tells us about the fate of her intervention motion below, then of course Falls Chase is perfectly correct: nonparty Saltiel is not entitled to file the rehearing motion by which she tells us these things. Fla.R. App.P. 9.330. So I join in the order striking Saltiel's motion for rehearing and the exhibits tendered with it.
But not without suggesting that the Saltiel episode, involving only a minor player in the piece, illumines the larger themes of this case as surely as one of Shakespeare's little plays within his plays. Phantomlike, Saltiel disappears from the circuit court without a trace, reappears briefly in our consciousness here, and finally is exorcised.
So the judicial branch, taking this matter over from the executive branch because we do not trust its processes to decide (subject to judicial review) the extent of its statutory powers, begins and ends by efficiently silencing one who had undoubted standing to be heard in the chapter 120 proceedings thereby intercepted. We helped secure Saltiel's right to be heard administratively in Clean Water, Inc. and Saltiel v. State Department of Environmental Regulation, 402 So.2d 456 (Fla. 1st DCA 1981). That troubling circumstance seems to me entirely at home in a decision that sacrifices values important to the judicial branch while justifying encroachment upon lawful decision-making powers of the executive.
The circuit court entered a judgment on the pleadings consisting of a complaint that alleged and an answer that denied that Lake Lafayette is separated from Upper Lake Lafayette and that "[t]he land is now dry, and has been used for years for farming and cattle grazing." If those factual issues were significant, then of course a judgment on the pleadings was inappropriate.
Falls Chase thought those issues were important, else Falls Chase would not have made those allegations. The Department thought those issues were important, else the Department would not have denied the allegations. The circuit judge thought and my colleagues think those issues are important, else they would not have made so much over Falls Chase's version of the facts, when entering and affirming this "judgment on the pleadings."
The Department thinks the issues are important because the Department regards "Upper Lake Lafayette" as part of Lake Lafayette, so that, though the upper reaches are at this moment wholly dry, they are inseparably a part of a lake that brims with water. As for how recently the upper reaches were also flooded, the Department thinks that issue is important because a fairly recent flood condition in "Upper Lake Lafayette" would imply a subsisting but transiently dry lake, soon to flood again in response to geologic changes. Thus the Department thinks its Rule 17-4.02 should not be woodenly construed to permit destruction of the lake basin at this moment simply because both water and indexed vegetation are temporarily absent.
For converse reasons the circuit judge thought and my colleagues think those issues are important too. For to them the question is not one of naked statutory or rule construction, bereft of facts (indeed, what question is ever bereft of facts?), but is rather whether the Department's position is or is not plausible or "colorable." So to them the Department's position becomes less "colorable," and a larger target for judicial intervention, as the true "Upper *821 Lake Lafayette" recedes into history, never likely to return again.
So in his judgment on the pleadings the circuit judge pointedly referred to "Upper Lake Lafayette which is alleged to have been high and dry and used for farming and cattle-raising for years." This sanitized ("alleged") description of "Upper Lake Lafayette" becomes, in the majority opinion, "essentially undisputed" facts. The threshold paragraph of the majority opinion, the foundation for all to come, reads in relevant part:
The facts are essentially undisputed.... The area sought to be regulated by DER has been dry for a number of years. Past uses include timbering, farming and grazing of cattle.
These "essentially undisputed" facts were of course disputed by the Department's answer.
It may be suggested that the Department otherwise conceded these asserted facts. It did not. The Department's brief filed in this Court simply says, "Upper Lake Lafayette is a lake which has gone partially and temporarily dry, a condition which has occurred in all the major lakes in the Tallahassee area." In legal memoranda filed in the trial court, the Department did mention farming and cattle:
Because it has gone dry and because the bottom lands have been grazed upon by cattle and sod-farmed in recent years, the vegetative indices ... no longer accurately define the actual landward extent of Lake Lafayette. (Memorandum filed October 5, 1979, p. 4.)
If the lake is only "temporarily dry," and if the vegetative indices "no longer accurately define the actual landward extent" of the lake because "the bottom lands have been grazed upon by cattle and sod-farmed in recent years," then we have a situation entirely different, I submit, than that portrayed by my colleagues' recital of the "essentially undisputed" facts.
Then there is reference to farming and cattle in a written report by Falls Chase's engineer to Falls Chase's lawyer; that report was attached to a letter from Falls Chase's lawyer to the Department's Secretary; that letter was in turn attached to the parties' "STIPULATION RESPECTING AGENCY INVESTIGATIONS PRELIMINARY TO AGENCY ACTION," which in the Spring of 1979 the parties signed in free-form dealings preparing for final agency action that, thanks to judicial intervention, never occurred. Falls Chase prevailed on the circuit judge, just before he entered this judgment on the pleadings, to declare the Stipulation "attached to the complaint and made a part of it." But no one has yet explained how this maneuver made the engineer's statement, in an attachment to an attachment to an attachment to an attachment to the complaint, an "essentially undisputed" fact for purposes of entering this judgment on the pleadings, or for purposes of sustaining it.
My colleagues' purpose being to suggest that Upper Lake Lafayette has been gone for so many "number of years" that there's no reason ever to expect it back, their opinion puts "timbering" at the head of the list of "past uses" of this dry land, and with great persuasive effect. "Timbering" of course implies timber which, I suppose, implies a stand of mature, marketable trees requiring many years of growth. But even the circuit judge did not mention "alleged" timbering, for it was not alleged. As far as I can tell, the record contains no reference anywhere, not even in the attachment to the attachment to the attachment to the complaint, to "timbering." As far as I can tell, that is a phantom forest.
If Saltiel, the phantom intervenor, should marvel that we punctiliously strike her photographs "clearly showing Falls Chase's red clay fill in the blue waters of Lake Lafayette," even as we solemnly describe that fill as placed on a dry ancient lakebed, where cattle graze "high and dry" and tall timbers are felled, I think her amazement could be excused. And as my interest is less in saving Lake Lafayette than in preserving a principle of judicial restraint that is more vulnerable, as it turns out, than any lake, I trust I may be excused for thinking this method of adjudication strange and *822 unworthy, no adequate substitute for chapter 120 processes.
I think these departures from conventional adjudication are systemic to the judicial processes recommended by my colleagues to replace chapter 120 processes when the extent of an agency's regulatory power is called into question. This sort of thing is all too likely to happen, to the most conscientious judge, when a court is asked to declare an agency's position "not colorable" and to do so "on the pleadings," as my colleagues recommend (text at fn. 19). Both the circuit judge and my colleagues wanted two inconsistent things: to avoid factual issues, and to know the facts about Lake Lafayette.
By excluding Saltiel and entering judgment on the pleadings, the circuit judge avoided, and Saltiel would say evaded, factual issues. But determining a matter on the pleadings does not usually produce the facts necessary to show that an agency's position is not at all plausible or, as my colleagues say, "not colorable." So the circuit judge was importuned to scavenge "alleged" facts from third-generation hearsay attachments to the "STIPULATION RESPECTING AGENCY INVESTIGATIONS PRELIMINARY TO AGENCY ACTION" (putting agencies on notice of how the judiciary will make use of these wholesome preliminary stipulations), and my colleagues raise those allegations to the level of "essentially undisputed" facts. Then they add "timbering" for good measure.
I think the circuit judge and my colleagues are victim to pressures that are innate in the judicial process proposed to replace chapter 120 processes  pressures that conventional adjudication ordinarily protects us from.
As jurisprudential method, what is offered suffers by comparison with orderly chapter 120 processes. Sound judicial values, as well as the integrity of the executive branch and the reputation of administrative processes, are among the undeserving casualties of this decision. All the more reason, I think, for adhering to the settled principle that
administrative remedies must be exhausted to assure that the responsible agency "has had a full opportunity to reach a sensitive, mature, and considered decision upon a complete record appropriate to the issue."
Key Haven Associated Enterprises, Inc. v. Board of Trustees of Internal Improvement Trust Fund, 427 So.2d 153, 158 (Fla. 1982), quoting with approval Key Haven, 400 So.2d 66, 69 (Fla. 1st DCA 1981).
NOTES
[1] Falls Chase Special Taxing District, created by Leon County Ordinance No. 75-6, enacted February, 1975, as a public body pursuant to Section 1.01(9), Florida Statutes. Other appellees are Sunshine Land Development, Inc. and Elba, Inc., landowners within the district.
[2] Fla. Admin. Code Rule 17-4.02, as amended in 1975 and in effect at the time pertinent to this litigation, is set out in note 10 infra.
[3] Id.
[4] "Ordinary high water mark" is not one of the criteria for jurisdiction specified in Section 403.817, Florida Statutes, set out in text infra, or Fla. Admin. Code Rule 17-4.02, as it existed in 1979, set out in note 11 infra.
[5] Falls Chase, as appellee, asserted the agency's lack of jurisdiction in the related administrative appeal in Case No. 79-1462, but the appeal was dismissed on other grounds.
[6] The stipulation of May 15, 1979 also provided, inter alia, that DER would waive its right to seek fines or penalties from Falls Chase while the survey was pending. Falls Chase agreed to limit its filling activities to specified areas, to submit after-the-fact permit applications for areas found to be within DER jurisdiction and to remove fill and restore affected sites within 90 days of DER's denial of applications or exhaustion of available judicial review of DER action.

Appellees Sunshine and Elba, private land-owners, were not parties to this stipulation.
[7] This court's Case No. PP-106. The record reveals no consideration of the merits of the controversy.
[8] The extraordinary writ of prohibition is a prerogative writ, not a writ of right, State ex rel. Washburn v. Hutchins, 101 Fla. 773, 777, 135 So. 298, 299 (1931), and its denial without written opinion does not bar subsequent consideration of jurisdictional issues, see, e.g., Public Employees Relations Commission v. District School Board, 374 So.2d 1005, 1010 (Fla. 2d DCA 1979), cert. denied, 383 So.2d 1193 (Fla. 1980):

It would be pure speculation to attribute any particular reasoning to the majority of the two prior panels of this court which decided that PERC's suggestions for writ of prohibition should be denied. The point is that those denials could have rested on reasons other than the merits of the jurisdictional question posed in those prior proceedings. This being the case, we hold that this court's prior denials of PERC's suggestions for writ of prohibition do not foreclose us from considering the jurisdictional issue on this appeal. (emphasis supplied)
See State v. Howell, 89 N.M. 10, 546 P.2d 858, 859 (1976):
Does the Supreme Court's denial of a Writ of Prohibition preclude our review of the trial court's denial of defendant's motion to dismiss? Our answer is in the negative... . [A] denial of a Writ of Prohibition may be for a variety of reasons... . Thus, the denial of a Writ of Prohibition has no specific finality. (emphasis supplied)
[9] This unique statutory provision suggests a legislative intention not to permit capricious modifications by the agency affecting its dredge and fill regulatory power.
[10] Fla. Admin. Code Rule 17-4.02, as it existed at the time pertinent to this litigation, in pertinent part:

Submerged lands: "Those lands covered by the categories of water listed in Sec. 17-4.28(2), F.A.C., including those lands contiguous to said waters where any of the following vegetational species, or any combination of such species, constitute the dominant plant community." [Thereafter followed a listing of the 50 different species of aquatic life referred to above.]
Uplands: "Lands landward of submerged lands upon which the dominant plant community is composed of any vegetational species, or combination of species, other than those listed under the definition of `submerged lands' and `transitional zone of a submerged land,' herein."
Transitional zones of submerged lands: "[Areas of land] between a submerged land, as defined in Subsection (17) above and an upland as defined in Subsection (18) above. It shall consist of the waterward first fifty (50) feet landward of a line defined by the landward limit of a submerged land, or the waterward quarter (1/4) of the area between a submerged land and an upland, whichever is greater, and upon which any of the following vegetational species, or combination of such species, constitute the dominant plant community." [Thereafter followed a listing of some 22 species of plant life.]
[11] The trial court's order, in pertinent part, is as follows:

It should be noted that the Department does not content that the District is engaged in any development operation violative of Section 403.817, F.S., or Rule 17-4.02. This case is rendered unique, says the Department, by the fact that Upper Lake Lafayette was drained when a geological fault or sink hole developed. Such fact justifies, it argues, asserting the more landward ordinary high-water mark as its regulatory boundary. When questioned from whence it derived the authority to determine the landward extent of Upper Lake Lafayette for regulatory purposes by reference to an historical line used only up to now to delineate public from private ownership or to determine ownership disputes, counsel claimed for the Department some inherent power or incipient rule-making authority to be exercised in the public interest.
....
In mandating a method for determining regulatory jurisdiction "based upon ecological factors," the Legislature expressly recognized that fluctuations in water levels are attributable on occasion to geological features. Thus, if as the Department contends, this is a case of first impression, it is so only because this is the first time the Department has endeavored to assert regulatory jurisdiction landward to the ordinary high-water mark.
[12] Maloney, "The Ordinary High Water Mark: Attempts at Settling an Unsettled Boundary Line," 12 U.Wyoming L.Rev. 1, 1-2 (1978):

In most states and in the federal system the ordinary high water line (OHWL) is the boundary between privately-owned riparian uplands and publicly-owned sovereignty lands beneath non-tidal navigable waters.
Id. at p. 2 note 2:
It is important to understand at the outset the scope of applicability of the OHWL definition. It applies to non-tidal, navigable water bodies, generally inland from the coast. It does not apply to inland non-navigable, and therefore privately-owned water bodies, although it may have some relevance in that context where the extent of surface usage of riparian owners must be defined [citations omitted].
[13] State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628, 635-36 (Fla. 1st DCA 1974), cert. dismissed, 300 So.2d 900 (Fla. 1974).
[14] Gardinier, Inc. v. Florida Department of Pollution Control, 300 So.2d 75, 76 (Fla. 1st DCA 1974); Department of Health and Rehabilitative Services v. Florida Psychiatric Society, Inc., 382 So.2d 1280 (Fla. 1st DCA 1980); Context Development Co. v. Dade County, 374 So.2d 1143, 1149-50 (Fla. 3d DCA 1979):

However laudable or commendable the actions of the appellees, ... "[i]t is well settled that a statutory agency ... does not possess any inherent powers; such agency is limited to the powers granted, either expressly or by necessary implication, by the statutes ... creating them."
[15] The availability of this remedy is doubtful because of the underscored language in Fla. Admin. Code Rule 17-1.119:

A declaratory statement is a means for determining the rights of substantially affected persons when a controversy, or when doubt concerning the applicability of any statutory provision, rule or order, has arisen before any wrong has actually been committed. (emphasis supplied)
Of course, lack of an available, adequate remedy is, in itself, a recognized exception to the exhaustion requirement: Ortega v. Owens-Corning Fiberglas Corp., 409 So.2d 530 (Fla. 1st DCA 1982); Northeast Airlines, Inc. v. Weiss, 113 So.2d 884 (Fla. 3d DCA 1959), cert. denied, 116 So.2d 772 (Fla. 1959); Deseret Ranches of Florida, Inc. v. State, Department of Agriculture and Consumer Services, 392 So.2d 1016 (Fla. 1st DCA 1981); Department of Transportation v. Morehouse, 350 So.2d 529 (Fla. 3d DCA 1977); cert. denied, 358 So.2d 129 (Fla. 1978); General Care Corp. v. Forehand, 329 So.2d 49 (Fla. 1st DCA 1976).
[16] 2 Cooper, State Administrative Law 577 (1965):

Where judicial attack upon an agency order is predicated on the theory that the agency has no jurisdiction to act in the premises, and the court finds that the objection is well taken, failure to exhaust administrative remedies is commonly excused.
Skinner & Eddy Corp. v. United States, 249 U.S. 557, 562-63, 39 S.Ct. 375, 377, 63 L.Ed. 772 (1919):
The contention is that the commission [Interstate Commerce Commission] has exceeded its statutory powers; and that, hence the order is void. In such a case the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the commission. [citations omitted] The District Court properly assumed jurisdiction of this suit. (emphasis supplied)
Coca-Cola Co. v. Federal Trade Commission, 475 F.2d 299, 303 (C.A. 5th 1973), cert. denied, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973):
The most widely recognized exception to the general rule against judicial consideration of interlocutory agency rulings is the class of cases where an agency has exercised authority in excess of its jurisdiction or otherwise acted in a manner that is clearly at odds with the specific language of a statute.
Mobil Oil Corporation v. Department of Energy, 469 F. Supp. 1119, 1123-24 (D.C.N.Y. 1979).
[17] See also Adams Packing Association, Inc. v. Florida Department of Citrus, 352 So.2d 569, 570-71 (Fla. 2d DCA 1977); School Board of Leon County v. Mitchell, 346 So.2d 562, 568 (Fla. 1st DCA 1977); State, Department of Health and Rehabilitative Services v. Lewis, 367 So.2d 1042, 1045 (Fla. 4th DCA 1979):

A distinction between a proceeding essentially seeking a review of agency action, and one essentially seeking a determination of rights has also been used as a litmus in determining jurisdiction. In the former case, the Administrative Procedure Act controls, whereas in the latter, jurisdiction lies in the circuit court.
[18] Schwartz, Administrative Law 510, 511 (1976).
[19] Id., at 508:

Since a jurisdictional claim can be raised in most cases, irresponsible allegations of lack of jurisdiction might be widely used to delay effective administration. In the vast majority of cases, however, the claim of lack of jurisdiction can be dealt with summarily on the pleadings without the need for any trial in the court. In the rare case, on the other hand, where the individual does make out a prima facie case of lack of agency jurisdiction over him, why should he have to resort to the expensive and time consuming administrative procedures which may convert the exhaustion of remedies into the exhaustion of litigants?
[20] In State ex rel. Department of General Services v. Willis, 344 So.2d 580 (Fla. 1st DCA 1977), general contractors brought suit for injunction in the circuit court to restrain DGS from completing bidding and contracting procedures. The basis for the suit was that the procedures violated usual and accepted standards for award of contracts for public works. Petition for writ of prohibition filed by DGS in this court was granted on the basis that the contractors had an adequate remedy available under Chapter 120.
[21] State ex rel. Department of General Services v. Willis, 344 So.2d 580, 590 note 10 (Fla. 1st DCA 1977).
[22] 3 K. Davis, Administrative Law Treatise 69 (1958).
[23] "Colorable  Seemingly valid and genuine, having an appearance of truth, right or justice." Webster's Third International Dictionary (unabridged). The term is used in the law to designate that which is apparent or prima facie, Wheeler v. Nickels, 168 Or. 604, 126 P.2d 32, 35-36 (1942); "not the thing itself, but only an appearance thereof," Broughton v. Haywood, 61 N.C. 380, 383 (N.C. 1867); colorable cause or colorable claim for the purpose of invoking or conferring jurisdiction is one which, on preliminary inquiry, shows that it is not "so unsubstantial and obviously insufficient either in fact or law, as to be plainly without color or merit and a mere pretense." In Re Cadillac Brewing Company, 102 F.2d 369, 370 (6th Cir.1939); a matter is not "colorably" under jurisdiction "[w]hen no facts are present or only such facts as have neither legal value nor color of legal value in the affair," Broom v. Douglass, 175 Ala. 268, 57 So. 860, 864 (1912).
[24] Odham v. Foremost Dairies, Inc., 128 So.2d 586, 593 (Fla. 1961), judicial intervention justified only where "[t]he invalidity of the administrative act is not subject to reasonable differences of opinion; American General Insurance Company v. Federal Trade Commission, 496 F.2d 197, 200 (CA 5th 1974), court declined to determine jurisdictional issue described as "close;" McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969), "[t]he courts ordinarily should not interfere with an agency until it has completed its action or else has clearly exceeded its jurisdiction" (emphasis supplied); Lone Star Cement Corporation v. Federal Trade Commission, 339 F.2d 505, 511 (CA 9th 1964), exhaustion required where jurisdictional issue "not free from doubt;" Schwartz, Administrative Law 511 (1976), exhaustion excused where "[o]n the pleadings it is clear that the agency lacks jurisdiction or that it is at least not clear that it possesses jurisdiction."

3 K. Davis, Administrative Law Treatise 69 (1958), factor to consider in excusing exhaustion: "degree of apparent clarity or doubt about administrative jurisdiction."
Jaffe, "The Exhaustion of Administrative Remedies," 12 Buffalo L.Rev. 327, 336 (1963):
I would agree with Judge Vanderbilt [writing for the court in Ward v. Keenan, 70 A.2d 77 (N.J. 1948)] that if the court can determine that there is little to be gained from an administrative hearing, or no jurisdiction whatever to hold it, there is no compelling, surely no invariable reason for forcing the parties through the expense, delay and exasperation of an administrative hearing... . To be sure, if there is a doubt, the doubt should be resolved in favor of the agency. It should appear with clarity that there is no scope for the exercise of administrative fact-finding or discretion. (emphasis supplied)
See also Swann, "Administrative Adjudication of Constitutional Questions," 33 U.Miami L.Rev. 527, 536, who proposes, as to constitutional questions, validity of statute and "other recognized exceptions to the exhaustion doctrine," this rule:
Where summary judgment is appropriate, submission to the agency may be dispensed with, but there should be no barrier whatsoever to a submission at the option of the party offering the challenge. (emphasis supplied).
Swann also states the following test for an "egregious error" under the Willis decision at 593:
An egregious error is one where the difficulty of the question is so slight that an agency error becomes evidence of incompetence or a willful disregard of duty. As such, the error is also evidence that resort to the agency's own corrective process is likely to prove futile. It is an error which renders the court so skeptical of the agency's purposes or capabilities that judicial intervention becomes necessary in order to secure the basic rights of the affected parties.
[25] See, e.g., Communities Financial Corp. v. Department of Environmental Regulation, 416 So.2d 813 (Fla. 1st DCA 1982), wherein DER's assertion of jurisdiction, although ultimately rejected by agency order which was adopted in the circuit court, raised a justiciable issue. This court held exhaustion of administrative remedies should have been required and, on that basis, set aside the circuit court's award of costs against DER. DER's claim of jurisdiction in that case required factual determinations and presentation of testimony.
[26] Capeletti Brothers; Inc. v. Department of Transportation, 362 So.2d 346, 348 (Fla. 1st DCA 1978), cert. denied, 368 So.2d 1374 (Fla. 1979), defines "free form" as:

[T]he necessary or convenient procedures, unknown to the APA, by which an agency transacts its day-to-day business. See H. Levinson, "Elements of the Administrative Process," 26 American Law Review 872, 880, 926 et seq. (1977).
[27] The originator of the term "free form," Professor Levinson, states (26 Amer.U.L.Rev. 872, 931):

Even if an agency is permitted to reach a decision on a free-form basis, the end result reflected in that decision is subject to jurisdictional and substantive standards. In brief, an agency may act only in situations within the jurisdiction conferred by law and may reach only those results that come within the substantive standards provided by law. (emphasis supplied)
In Department of Professional Regulation v. Hall, 398 So.2d 978 (Fla. 1st DCA 1981), this court approved the circuit court's refusal to dismiss a jurisdictional challenge to DPR in a dispute involving agency action referred to by this court as "free form."
[1] The Department's various communications to Falls Chase, including its stop-work directive of August 9, 1979, was "free-form" action only, those "necessary or convenient procedures, unknown to the APA, by which an agency transacts its day-to-day business." Capeletti Bros., Inc. v. Dept. of Transportation, 362 So.2d 346, 348 (Fla. 1st DCA 1978), cert. den., 368 So.2d 1374 (Fla. 1979). Formal enforcement of chapter 403 required the Department to institute circuit court proceedings for injunctive relief, fines or damages. Sections 403.131, .141, .121(1), Fla. Stat. (1979). The Department also might have instituted administrative proceedings to establish liability and damages for water pollution, subject to court enforcement, or to abate the violations. Section 403.121(2), Fla. Stat. (1979).
[2] K. Davis, Administrative Law Treatise § 20.11 at 279, 283 (1982 Supp.).
[3] Id. at 296.
[4] The Department considered Lake Lafayette a "lake," as the term is used in section 403.031(3), Florida Statutes (1979), defining "waters" subject to the Department's regulation. Its counsel pointed out that Rule 17-4.28, Florida Administrative Code, stated that the Department had authority over dredge-and-fill activities in "natural lakes," with certain inapplicable exceptions. Under Rule 17-4.28(2), he continued, the Department also had dredge-and-fill jurisdiction over "submerged lands," including both lake bottoms and the areas at the edge of lakes. The Department concluded that the statutory vegetation list was useful only to identify submerged lands at the edge of lakes, but that lake bottoms were subject to regulation even in the absence of such vegetation. In the case of Lake Lafayette, the Department said the ordinary high water line, the common law boundary determining the extent of sovereignty waters, identified the extent of the lake bottom subject to chapter 403 regulation.
[5] The joint Administrative Procedures Committee reviews the statutory bases for agency rules and provides general legislative oversight of administrative action. Section 11.60, Fla. Stat. (1981).
[6] 5 U.S.C. § 554(e) provides:

The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty. (Emphasis added).
A federal agency is not required to issue a declaratory order if asked, unless failure to do so is a clear abuse of discretion. Yale Broadcasting Co. v. Fed. Communications Comm'n, 478 F.2d 594, 602 (D.C. Cir.1973), cert. den., 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973).
[7] Chapter 28-4, Fla. Admin. Code.
[8] Section 403.121(2)(b), Fla. Stat. (1979):

If the department has reason to believe a violation has occurred, it may institute an administrative proceeding to order the prevention, abatement, or control of the conditions creating the violation or other appropriate corrective action.
[9] To remedy chapter 403 violations section 403.121(1)(a) provides:

The department may institute a civil action in a court of competent jurisdiction to establish liability and to recover damages for any injury to the air, waters, or property, including animal, plant, and aquatic life, of the state caused by such violation.
The Department also may seek injunctive relief in a circuit court, under section 403.131, Fla. Stat., and fines under section 403.141, Fla. Stat. After Falls Chase took its case to circuit court, the Department did file, subject to its motion to dismiss for failure to exhaust administrative remedies, a counterclaim for injunctive relief and fines from the Falls Chase developers for dredge-and-fill activities they had undertaken without a permit below the ordinary high water line of the lake.
[10] Falls Chase contracted to build the water and sewer systems at the end of June, after the Department issued a permit for the sewer system. But the Department stayed that permit on July 9, 1979, to allow an appeal by third parties. Falls Chase then claimed interest on its sewer bonds was accruing at $450 a day, and that total interest on all its bond issues for projects dependent on sewer lines was accruing at $1,450 daily. The Department's Secretary found in its July 9 order staying the permit that the "largest specific and direct operational cost" to Falls Chase as a result of the stay would be attorney's fees.
[11] A party seeking review was required to file a notice of appeal within 15 days of receiving the document representing final agency action. Rule 17-1.72(1), Fla. Admin. Code. Appellant was required to file an initial brief within 20 days of the filing of notice of appeal. Rule 17-1.74(1). Appellee's answer brief was due 15 days later, and appellant's reply brief, if any, was due 10 days later. Rule 17-1.74(2), (3), Fla. Admin. Code.
[12] The judgment on the pleadings recites that the motion to dismiss for failure to exhaust administrative remedies was "not well-founded" and that the court had "denied it in open court." The judgment did not discuss the factual issues on that subject made by the complaint and the answer filed before the motion to dismiss was denied.
[13] After reciting that the motion to dismiss had been denied "in open court" the judgment stated, "the parties to this dispute agree that what the Court believes to be the threshold issue framed in the pleadings is now ripe for determination." There is no suggestion here that the Department abandoned its insistence on exhaustion of administrative remedies; presumably its "agreement" was that if the court was going to decide the case there was no reason for delay.
[14] The commission found that the petition for a section 120.57 hearing substantially re-alleged claims previously raised and denied by the Department earlier on May 11. Accordingly the Commission held the appeal untimely because not filed within 15 days of the May 11 order. Rule 17-1.72(1), Fla. Admin. Code. This Court later reversed the Commission's order of dismissal, finding that the third parties had been denied a clear point of entry to challenge the arrangement between Falls Chase and the Department, by stipulation dated May 15, allowing construction to proceed subject to after-the-fact regulation of dredge-and-fill below the high water line later identified. Clean Water, Inc. v. Dept. of Environmental Regulation, 402 So.2d 456 (Fla. 1st DCA 1981).
[15] 344 So.2d at 590.
[16] E.g., Graham v. Vann, 394 So.2d 178 (Fla. 1st DCA 1981); Dept. of Revenue v. Arvida Corp., 315 So.2d 235 (Fla. 2d DCA 1975), cert. dism., 336 So.2d 1181 (Fla. 1976); Swinscoe v. Dept. of Revenue, 320 So.2d 11 (Fla. 4th DCA 1975), cert. dism., 337 So.2d 976 (Fla. 1976).
[17] W.D. Snodgrass, "Tact and the Poet's Force," in In Radical Pursuit, Critical Essays and Lectures 7 (1977).